Victor A. Segovia, Esq. Bar No. 146576
The Segovia Law Office
712 Bancroft Road, Number 268
Walnut Creek, CA 94598
(925) 674-0185; (925) 674-0165 fax

For Plaintiff José Duarte

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE DUARTE<br>        Plaintiff,<br>vs.<br>THE STANDARD INSURANCE<br>COMPANY, a subdivision of STANCORP,<br>and DOES 1 THROUGH 50,<br>        Defendants | CASE NO: CV 08-03021 JSW<br><br>Hearing: August 29, 2008<br>Time: 9:00 AM<br>Courtroom 2, 17th Floor<br>450 Golden Gate Avenue<br>San Francisco, California |

## __DUARTE MOTION FOR REMAND__

Mr. Jose Duarte motions for remand in accordance with 28 U.S.C. § 1447.

### BACKGROUND

Upon returning to teaching in Oakland after a long interruption to attend law school, The Standard Insurance Company, through Oakland Unified School District, insured Duarte against disability.

On his second teaching day, two students viciously attacked Duarte in the classroom causing severe physical and emotional injuries resulting in permanent disability from teaching.  Exhibit 1 Complaint ¶14 - 21.  Duarte made a claim and as per the Policy, SIC paid Duarte's disability claims but imposed a 24-month limitation unless Duarte could prove "disabled from Any Occupation… due to physical conditions alone." Exhibit 1 Complaint ¶¶ 26, 33.

SIC and Duarte exchanged correspondence concerning his disability, terms and definitions of the policy, "amendments" to the policy, and medical records supporting disability diagnosis. Exhibit 1 Complaint ¶27 - 37.  SIC finally stopped payments to

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA 94598

DUARTE MOTION FOR REMAND: D' Motion For Remand.doc

Duarte after 24 months despite their continuing to review his claim. Exhibit 1 Complaint ¶ 37.

Whereupon Duarte filed suit in Alameda Superior Court of California on February 1, 2008, alleging six causes: 1) breach of contract, 2) breach of the covenant of good faith and fair dealing, 3) bad faith breach, 4) Unruh Act violations under Civil Code § 51, 5) Unfair Practices Act violations under California Business and Professions Code § 17200 and 6) declaratory relief.

Under 28 U.S.C. § 1441, SIC removed on June 19, 2008, claiming there was original jurisdiction based upon diversity of citizenship under 28 U.S.C. § 1332. Duarte, however, contends there is no diversity of citizenship because the amount in controversy does not exceed $75,000, and SIC's other business operations are so extensive in California that it is a citizen of this state for all practical purposes, including diversity.

## DISCUSSION

Diversity jurisdiction in federal court requires both diversity of citizenship and an amount in controversy that is in excess of $75,000. 28 U.S.C. § 1332. For this Court to have jurisdiction, SIC must prevail on both issues and the burden of proving both of these requirements lies with it. *Fenton v. Freedman*, 748 F.2d 1358, 1359 n. 1 (9th Cir.1984).

I.    AMOUNT IN CONTROVERSY DOES NOT EXCEED $75K

The validity of the contract between the parties is not in question, the parties accept the contract is valid and enforceable. The "controversy" centers on SIC's stated reason for denying disability payments after 24 months, "Is Duarte 'disabled from Any Occupation… due to physical conditions alone.'" If Duarte *is* disabled from any occupation due to a physical condition alone, he is to receive disability payments beyond 24 months under the contract. If SIC denied benefits while there existed a bona fide doubt regarding coverage beyond 24 months that too may be actionable. All

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA 94598

other possible actionable conduct of SIC is inconsequential until either of these two questions is resolved in Duarte's favor.

"A removing defendant has the burden of proving the existence of federal jurisdiction." *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1356 (11th Cir. 1996). "Removability should be determined according to the plaintiff's pleading at the time of the petition for removal." *Coker v. Amoco Oil Co.*, 709 F.2d F.2d 1433, 1440 (11th Cir. 1983). It is well settled that the question of subject matter jurisdiction is a snapshot of the Complaint at the time of removal. *Chadwick v. Shell Oil Co.*, 828 F.Supp. 26, 27 (E.E. La. 1993). "Only the amount of the installments unpaid at the commencement of the suit may be taken into account, even though the judgment will be determinative of the company's liability for future installments." 14A Charles Alan Wright et al., Federal Practice and Procedure § 3710 (2d ed. 1985). It is upon SIC's shoulders therefore to prove the amount in controversy for purposes of diversity exceeds $75,000 and simply declaring Duarte may recover a larger sum is not enough.

SIC references Duarte's Complaint at paragraph 110 to allege the amount in controversy exceeds $75,000 because Duarte request payments of either $1,200 or $1,599.84 per month until he reaches age 65 and because Duarte prays for restitution, disgorgement of profits and punitive damages.

"Unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." S*t. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). In *St. Paul Mercury*, the Court announced the now famous "legal certainty" test for diversity cases: In order for a federal court to decline jurisdiction, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.* at 289, 58 S.Ct. at 590.

Only if SIC is required to pay *upfront* all of the possible disability payments Duarte's *might* receive during his lifetime, assuming he lives twenty more years,

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA 94598

would the amount in controversy exceed $75,000 at the time of removal.  But SIC is not required to make all future payments up front.

In its answer [Notice of Removal at 2:¶3] SIC denied each and every one of Duarte's allegations, including the implied one that he may *live* another day, let alone twenty more years.  So even if Duarte prevailed on every one of his claims, he would still have to live ($75,000/$1,599.84) 46 months from February 2006 to accumulate disability payments exceeding $75,000. Future disability payments are not therefore "in controversy" for purposes of removal calculations.

In February 2006, SIC stopped payments to Duarte.  Exhibit 1 Complaint ¶ 37. From the last payment until removal, from February 2, 2006, to June 19, 2008, is 28 months.  All that is in controversy therefore is $44,795.52, which is 28 months of $1,599.84 disability payments to use Duarte's higher proposed figure, well below $75,000.

As for Duarte's prayers for restitution, disgorgement of profits and punitive damages, SIC merely states that the court must consider these amounts:

> Plaintiffs seeks restitution, disgorgement of profits, as wells as punitive damages and attorneys' fees, which amounts must be considered in calculating the amount in controversy.  (Removal Notice at 2:26-27).

Except that Duarte places no dollar figures for each of these remedies in his Complaint and SIC offers no formula on how the court would calculate a dollar sum to a "legal certainty."

Duarte respectfully prays for remand because the amount in controversy is only the amount of disability payments not received since February 2006 a figure far less than $75,000 and the other remedies prayed for are too speculative at this stage for the court to arrive at a legally certain dollar figure.

## II. EXTENSIVE BUSINESS DEALINGS IN CALIFORNIA MAKES THE STANDARD INSURANCE COMPANY A CALIFORNIA CITIZEN FOR DIVERSITY PURPOSES

### A. Standard Insurance Company's Business Presence

SIC claims to not have sufficient presence in California for diversity.  In making this claim, SIC offers the declaration of a paralegal, Ms. Rebecca L. Jeffrey, which in a separate document Duarte moves to strike because she is not qualified to testify on the matters she asserts are true and because her declaration is inadmissible hearsay.  (See Duarte Motion To Strike Defendants' Declaration In Support Of Removal.)

Everything Jeffrey declares to be true "based on information and belief" is in fact therefore based on lack of personal knowledge rendering her incompetent to testify on the matter.  Jeffrey even goes so far as include charts and figures in her declaration even though she is not an expert in anything and without explaining her qualifications or the materials necessary to produce the charts in the first instance.

Through Jeffrey's incompetent declaration though, SIC nevertheless asserts that it is not a resident of California for diversity jurisdiction sake because, "The vast majority of Standard's employees, real property and personal property are located in Oregon." Removal Notice at 3:14-16.

Duarte discounts these factors because they are not a true measure of the business presence of an insurance company.  The business presence of any company should be measured by what is does and for whom it does it.  In terms of insurance, that means insureds.  The majority of SIC's insureds determines its presence in any given location. So even if the court were to seriously consider Jeffrey's declaration "based on information and belief[1]" that 90 % of SIC's Personal Property consisting of "computers hardware, artwork, copiers, furniture, personal computers, telephones, and other office equipment" is in Oregon, it means nothing. Similarly, why is *artwork* even included for this analysis, it's immaterial.

Moreover, SIC may not actually know how extensive its presence in California is because in the manner that its policies are issued.

---

[1] Federal Rules of Evidence 602 "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  By stating that her testimony is based on information and belief, Jeffrey admits its not personal knowledge.

DUARTE MOTION FOR REMAND: D' Motion For Remand.doc

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

1    Here, OUSD issued Duarte one of SIC's disability insurance policies.  When it

2    did that, all of SIC's asset remained static while its business presence in California

3    increased by one more insured.

4    Duarte asserts the true measure of SIC's business presence is not where it keeps

5    its artwork but where its business takes it, to where its insureds are.  Because SIC

6    purposefully did not provide that information and purposely produced only the

7    declarations of an incompetent witness, SIC has not met its burden to establish

8    diversity.

9    Respectfully, Duarte prays this matter is remanded because SIC has failed to

10   provide the Court with sufficient *admissible* evidence on which to find whether there

11   is diversity jurisdiction and on that basis must resolve the uncertainty in Duarte's

12   favor.

13   B.  Parent Company Alter Ego Test Of Citizenship

14   According to its financial statements, SIC is a wholly owned subsidiary of Stancorp

15   Financial [Exhibit 2, p. 3, 4].  As such, it takes on the citizenship of its principal,

16   controlling corporation, Stancorp. (*One Communications Corp. v. Sprint Nextel Corp.*,

17   2007 WL 1991402 (D.Mass.2007) [As wholly owned subsidiaries of corporation, each

18   of the limited liability company plaintiffs was deemed to be a citizen of Delaware and

19   New York, the states of which their owner was a citizen, for purposes of diversity

20   jurisdiction].)

21   SIC and Stancorp share the same CEO and board of directors [Exhibit 3].

22   Duarte asserts that a corporation that shares it Chief Executive Officer and its board of

23   directors with the parent company that owns all of its share is in fact an alter ego of its

24   parent and therefore the court should use the alter ego test of *Powers v. Fox Television*

25   *Stations, Inc.,* 907 F.Supp. 719 (S.D.N.Y.1995) to determine SIC's citizenship.

26   Stancorp has billions of dollars worth of real estate holdings in California.

27   Where principal assets of corporate defendant consisted of land and mineral

28   interest located within a state, that corporation's citizenship is that of the state in

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

1  which it's principal land holdings are located. . *Arellano v. Home Depot U.S.A., Inc.*,

2  S.D.Cal.2003, 245 F.Supp.2d 1102.   In *Arellano*, for purposes of determining

3  citizenship of corporation, for diversity purposes, California was not corporation's

4  "place of operations," by virtue of containing "substantial predominance" of its

5  tangible property, where approximate fair market value of its taxable tangible property

6  was $629 million in Georgia, $604 million in Texas, and $408 million in California.

7  Unlike *Arellano*, the overwhelming majority of the Stancorp's tangible land holdings

8  are in California, according to its 2007 Form 10-K annual report submitted to the

9  Securities Exchange Commission (Exhibit 2).  According to that same form 10-K, in

10  2006, the Stancorp acquired $1.036 billion dollars worth of land in California as part

11  of its mortgage operations; this sum represented 31.2% of its nation wide activity

12  (Exhibit 2, p. 57).  The next largest concentration of investment activity is Texas with

13  10%.  Id.  In 2007, the Stancorp acquired $1.096 billion for 30% of it's total revenue

14  dwarfing all other states.  The Stancorp's land holdings, dollars loaned, and interest

15  received there from *in Oregon* does *not* even appear on the radar screen since it is

16  insignificant.

17         Stancorp acquires billions of dollars worth of land holdings every year as part

18  of its mortgage lending operations (Exhibit E):

| Year | State | Land Holdings in millions of $ dollars | Percentage of operations |
|------|-------|----------------------------------------|--------------------------|
| 1998 | California | 747.8 | 43.8 |
| 1999 | California | 738.6 | 41.5 |
| 2000 | California | 856.5 | 41.5 |
| 2001 | California | 815.3 | 40.7 |
| 2002 | California | 766.7 | 38.6 |
| 2003 | California | 858.3 | 37.06 |
| 2004 | California | 981 | 33.3 |
| 2005 | California | 1011.00 | 31.2 |
| 2006 | California | 1,036 | 31.2 |
| 2007 | California | 1,096 | 30 |
| Total | | 12, 065.10 | |

DUARTE MOTION FOR REMAND: D' Motion For Remand.doc

1    From 1998 to the present, the Stancorp has acquired 12 billion dollars worth of

2  land in California.  It's land holdings in Oregon are a paltry 7-8% year after year

3  (Exhibit 4).  No other holdings in any other state come close.

4    Stancorp's holdings are overwhelmingly in California.   The Stancorp's

5  presence in and reliance on California's protections are overwhelming.  Moreover,

6  Stancorp admits in its Form 10k that its assets and business activities are heavily

7  concentrated in California, which exposes them to greater risk due to the natural and

8  political climate in California (Exhibit 2, p. 13).

9    Thus, the Stancorp's citizenship for diversity purposes is California *and by the*

10 *same token so is SIC's*.

11   Respectfully, Duarte prays for remand on the basis that SIC's citizenship should

12 be the same as the company that owns all of its share and with whom it also shares a

13 CEO and board of directors, Stancorp.  Just is property alone (to use SIC's same

14 reasoning that ownership of property should determine it citizenship), Stancorp's is a

15 citizen of California because of the vast property it owns here.

16   III.    REASONABLE COSTS AND ATTORNEYS FEES UPON REMAND

17  "An order remanding the case may require payment of just costs and actual expenses,

18 including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447 (c).

19 Also see , *Morris v. Bridgestone/Firestone, Inc.*, 985 F.2d 238 (6th Cir.

20 1993)(removal followed by remand warrants an award of attorney's fees); *Gray v.*

21 *New York Life Ins. Co.*, 906 F.Supp. 628 (N.D. Ala.)(good faith is no defense to a 28

22 U.S.C. § 1447 (c) fee claim).

23   Duarte was forced to respond to SIC's defective removal and is entitled to

24 reasonable attorney's fees and costs associated with this motion.

25                                        **CONCLUSION**

26 Duarte respectfully prays for remand to the Superior Court of Alameda County,

27 California, for attorneys' fees, and for costs, if applicable.

28   July 20, 2008          The Segovia Law Office

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA 94598

DUARTE MOTION FOR REMAND: D' Motion For Remand.doc

/S/ *Victor A. Segovia*
Counsel to Plaintiff

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DUARTE MOTION FOR REMAND: D' Motion For Remand.doc

Victor A. Segovia, Esq. Bar No. 146576
The Segovia Law Office
712 Bancroft Road, Number 268
Walnut Creek, CA 94598
(925) 674-0185; (925) 674-0165 fax

For Duarte José Duarte

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE DUARTE<br>        Duarte,<br>vs.<br>THE STANDARD INSURANCE<br>COMPANY, a subdivision of STANCORP,<br>and DOES 1 THROUGH 50,<br>        Defendants | CASE NO: CV 08-03021 JSW<br><br>Hearing: August 29, 2008<br>Time: 9:00 AM<br>Courtroom 2, 17th Floor<br>450 Golden Gate Avenue<br>San Francisco, California |

## DUARTE NOTICE OF MOTIONS FOR REMAND
## AND TO
## STRIKE DEFENDANT'S DECLARATION IN SUPPORT OF REMOVAL

TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

GREETINGS.  Notice is hereby given of hearings as showing in the above

caption before the Honorable Jeffrey S. White on Mr. Jose Duarte's motions for

REMAND and to STRIKE DEFENDANT'S DECLARATION IN SUPPORT OF

REMOVAL.

These motions are based on the documents listed in the Certificate of Service,

and this notice, and the arguments of counsel if any.

July 21, 2008                The Segovia Law Office

/S *Victor A. Segovia*
Counsel to Duarte

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

1  Victor A. Segovia, Esq. Bar No. 146576
   The Segovia Law Office
2  712 Bancroft Road, Number 268
   Walnut Creek, CA 94598
3  (925) 674-0185; (925) 674-0165 fax

4  For Duarte José Duarte

5

6

7

8

          IN THE UNITED STATES DISTRICT COURT

        FOR THE NORTHERN DISTRICT OF CALIFORNIA

9  JOSE DUARTE                          CASE NO: CV 08-03021 JSW
          Duarte,
10                                       Hearing: August 29, 2008
   vs.                                   Time: 9:00 AM
11                                       Courtroom 2, 17th Floor
   THE STANDARD INSURANCE                450 Golden Gate Avenue
12 COMPANY, a subdivision of STANCORP,   San Francisco, California
   and DOES 1 THROUGH 50,
13        Defendants

14              __DUARTE MOTION TO__
    __STRIKE DEFENDANTS' DECLARATION IN SUPPORT OF REMOVAL__

15 Mr. Jose Duarte objects to and motions to strike The Standard Insurance Company's

16 declaration in support of removal because the witness lacks personal knowledge and

17 sufficient corporate position to testify on the financial status and affairs of the

18 company as it relates to diversity jurisdiction.

19        The declaration of SIC's paralegal purports to provide the court with first hand

20 personal knowledge but in fact that is not the case.

21        Ms. Rebecca J. Jeffrey begins with "I have personal knowledge of the facts" but

22 then recants that with facts based on information and belief.  And, "For the facts based

23 on information and belief… *I gather information from individuals within the company*

24 *with such knowledge*."  Declaration of Rebecca J. Jeffrey In Support of SIC's Notice of

25 Removal at 1:¶2.  Jeffrey's entire declaration is inadmissible multiple hearsay not

26 within any exception under Rules 801(c) and 802 of the Federal Rules of Evidence.

27 And, because she is not an expert, a party or a person whom SIC acted through, her

28 state of mind, i.e., her knowledge and beliefs, are irrelevant.

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA 94598

1    [E]vidence submitted to the court must meet all statutory requirements for

2    admissibility of evidence at trial. *Cal. Prac. Guide Fed. Civ. Pro. Before Trial* Ch.

3    12-B, §12: 57.  Evidence received at a law and motion hearing must be by declaration,

4    affidavit, or request for judicial notice. *Id.*; CRC 323(a); Declarations or affidavits

5    must be from competent witnesses having personal knowledge of the facts stated

6    therein, rather than hearsay or conclusions. *Cal. Prac. Guide Fed. Civ. Pro. Before*

7    *Trial* Ch. 12-B, §12: 57.

8    Jeffrey *only acquired information* from individuals within the company who

9    supposedly have *such knowledge*. She does not identify how many individuals she

10   contacted, who these individuals are, what positions these individuals held, how long is

11   their length of service, what is their job duties and responsibilities, nor does she state

12   when she spoke to them, how was the information transmitted, nothing.

13   Jeffrey does not even testify to what *her* education and experience is.  The court

14   has no way of knowing if Jeffrey adequately understood whatever information she

15   acquired much less testify on "substantial predominance of [SIC]'s business

16   activities."

17   And her basic facts, "[W]here [SIC] employs people, generates revenues, owns

18   assets or keeps and maintains its headquarters," are *misleading*. Take, for example,

19   "where SIC" employs people.

20   Jeffrey did not verify if indeed there are 2,437 SIC employees in Oregon [Decl.

21   RLJ at 2:18] because she did not conduct an independent personal investigation of her

22   own to very any fact she believes is true. Nor does Jeffrey tell us whether the statement

23   "SIC employs people" means independent contractors as well as employees. It is

24   common knowledge in the insurance industry that policies are "sold" by individuals

25   not employed by the insurer.  Here for example, OUSD handed Duarte SIC's disability

26   policy though OUSD would not be listed as an employee or contractor of SIC.  And

27   yet, OUSD's act of employing Duarte and handing him a SIC disability policy means

28   SIC's legal business in California increase by one more insured while all the factors in

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

DUARTE MOTION TO STRIKE DEFENDANTS' DECLARATION IN SUPPORT OF REMOVAL; D' Motion To Strike.doc

1   Jeffrey's declaration remained unchanged.  The only question is did the new insured

2   raise the legal business to such a level that SIC *is, or became,* a resident of Calilfornia

3   for diversity purposes.  SIC may actually have millions of Californians covered by its

4   policies, more than all the inhabitants of Oregon, giving it sufficient presence in

5   California for diversity jurisdiction purposes and yet the number of people it employs,

6   or the real and personal property of the company (artwork), or where it maintains it

7   headquarters, et cetera, et cetera, could remand statis and substantially in Oregon.

8         SIC's business presence in California for purposes of diversity cannot really *be*

9   measured by where it owns assets, employs people, or generates revenue. The true

10  measure of SIC's presence in California is how may people in California, as compared

11  to Oregon, are covered in one way or another by its policies, which Jeffrey doesn't

12  mention at all!

13        A proper, competent witness would be a Chief Financial Officer at SIC, with

14  intimate knowledge of the insured and their locations.  In the absence of a competent

15  witness, the declaration provided is hearsay. Under FRE 602, Jeffrey lacks personal

16  knowledge and is therefore incompetent to testify on the matters she declares are true

17  and her state of mind, i.e., *what she believes*, is irrelevant.

18        For the foregoing reasons Jeffrey's declaration should be stricken form SIC's

19  Notice of Removal.

20

21   July 13, 2008              The Segovia Law Office

22                             /s/Victor A. Segovia
                               Counsel to Duarte

23

24

25

26

27

28

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

DUARTE MOTION TO STRIKE DEFENDANTS' DECLARATION IN SUPPORT OF REMOVAL; D' Motion To Strike.doc

Jose Duarte
5319 Broadway Terrace #103
Oakland, California
(510) 653-9999

In forma pauperis

ENDORSED
FILED
ALAMEDA COUNTY

FEB 0 1 2008

CLERK OF THE SUPERIOR COURT
By Esther Coleman, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

JOSE DUARTE
    Plaintiff,

vs.

THE STANDARD INSURANCE COMPANY, a
subdivision of STANCORP, and DOES 1
THROUGH 50,
    Defendant(s)

CASE NO: RG08369292

PLAINTIFF'S COMPLAINT FOR
DECLARATORY RELIEF, INJUNCTIVE
RELIEF, AND DAMAGES

Mr. JOSE DUARTE, the plaintiff, demands a jury trial and states:

1.  Duarte sues THE STANDARD INSURANCE COMPANY for its failure to pay him disability

insurance benefits to age 65 pursuant to an insurance policy (Exh. A).  On December 4, 2003,

Duarte was brutally attacked while teaching for Oakland Unified School District (Exh. B).  In

December 2004, Duarte applied for disability benefits. Standard denied Duarte his disability

benefits in part, only committing to paying said benefits for a 24 months referencing suspect policy

"amendments" and using questionable calculation methods.

**STANDING**

2.  Standard harmed Duarte.

**JURISDICTION AND VENUE**

3.  Standard maintains sales and service offices in San Francisco, CA, and purposefully transacts

significant business in California.  Consequently, the Court has personal jurisdiction over Standard

pursuant to Code Civil Procedure section 410.10. (Exh. I).

-1-

Exhibit 1

4. The Court also has jurisdiction over the subject matter because it involves a contract that became enforceable against the parties in Oakland, California.

5. Venue is proper in this Court because the unlawful conduct alleged below was and is now being committed in Alameda County.

## PRINCIPAL REMEDIES SOUGHT

6. This is a contract action seeking equitable relief against Standard and not a tort action. Duarte seeks only equitable relief and only in the alternative damages if this Court construes unpaid benefits as money damages. Examples of equitable remedies include back pay[1] or most accurately in this case, back due benefits and/or benefits improperly withheld. Duarte seeks equitable remedies in the form of declaratory relief to determine the terms of the disability insurance contract and specific performance. Retroactive remedies in the form of unpaid benefits or the amount owed to Duarte due to Standard's incorrect calculations may sound in either law or equity.

## PARTIES

7. Duarte is an adult citizen of the United States and a resident Oakland, California. At the time of the injury, he was 38 years old and a probationary employee of OUSD as a credentialed Spanish teacher assigned the School for Social Justice.

8. Standard is an insurer and is a subdivision of the StanCorp. Financial Group a corporation incorporated in Oregon. Standard was incorporated under the laws of the State of Oregon. Standard maintains sales and service offices in San Francisco, CA, and purposefully transacts significant business in California (Exh. I).

## BACKGROUND FACTS

---

[1] Title VII of the Civil Rights Act of 1964 instructs that, to redress violations of the Act, courts may award, *inter alia*, "appropriate ... equitable relief," including "reinstatement or hiring of employees, with or without back pay." 42 U. S. C. §2000e-5(g)(1).

-2-

PLAINTIFF'S COMPLAINT

Exhibit 1

9.  Duarte taught from 1992 until December 4, 2003, taking breaks from teaching to return to school. As a result of vicious attack on him, Duarte is totally disabled from teaching.

10. On February 2004, Duarte lost his second job as a paralegal because he could no longer do his work as a result of Post Traumatic Stress Disorder. He gets frequent lapses in concentration and blank outs.

11. On November 2004, Duarte made a futile attempt to return to work as a paralegal but was terminated because he made numerous mistakes and could not keep up with the multiple tasks as a result of his cognitive problems. Thus, Duarte is impaired from his secondary line of work, paralegal, as discussed by Dr. Felix below.

12. Between 1994 and 1997, Duarte had been a fire fighter for the California Department of Forestry. This work entailed responding to medical emergencies, lifting victims weighing 150 pounds, lifting hydraulic tools weighing 70 pounds, climbing ladders, and pulling charged hose line weighing over 200 pounds. Duarte is disabled from firefighting due the impinged shoulder.

13. The insurance policy provides for payment of benefits for disability from one's own line of work and any line of work for which one is qualified. The policy does not make any distinction between physical injury causing physical symptoms and psychiatric injury causing physical symptoms. An ambiguity exists as to whether the limitation on mental illness applies to mental illnesses having *physical manifestations* or physical injuries having psychological symptoms. Duarte has both an impinged left shoulder and physical symptoms of nausea, convulsions, and headaches would be physical disabilities for which any limitations on psychiatric illness would not apply.

## FACTS

14. On or about December 1, 2003, OUSD hired Duarte to teach high school Spanish. Ms. Betty Succo, OUSD's Human Resources Officer, handed Duarte an employment packet that included health,

-3-

Exhibit 1

dental, and disability insurance information. In that packet was a disability insurance policy from

Standard, a true and accurate copy of that policy is attached (Exh. A).

15. on December 3, 2003, Duarte reported for his first day of work at the School for Social Justice, part of OUSD.

16. On December 4, 2003, Duarte was viciously attacked by two students, Demario Freeland and Vuyo Mbuli.

17. On or about December 4, 2003, at approximately, 12: 00 noon, DeMario Freeland burst into Duarte's classroom through an adjacent classroom door which had been blocked by heavy desks to prevent intrusion from the next classroom. Freeland's violent entry into the classroom shocked students. Upon entering Duarte's classroom Freeland went around the class disrupting other students. Duarte demanded that he leave, but Freeland refused and continued to disrupt the class with loud outbursts. At or about 12:10 Freeland walked out of Duarte's classroom, and Duarte locked the door behind him. At 12:15 there was a knock at the door, and Duarte opened the door to see who it was. Freeland had returned with Vuyo Mbuli, who is 5'10" and weighs approximately 180 lbs.

18. Mbuli made abusive remarks to Duarte because he had not allowed Freeland to enter after bursting into the classroom earlier. Duarte told them that they could not enter. Then both Freeland and Mbuli angrily rammed Duarte knocking him backward and injuring his left shoulder and arm. While Duarte was teaching the other students, Mbuli taunted Duarte and threatened to kill him repeatedly.

19. Later, while Duarte was in the office to make a formal report of the incident, Mbuli was in the office and attacked and threatened Duarte a second time.

20. On or about December 4, 2003, Duarte notified the Oakland Police Department that he had been a

-4-

Exhibit 1

victim of a violent crime and filed a report.

21. As a result of the attack and in addition to the injury to the shoulder, Duarte suffered Post Traumatic Stress.

22. On or about December 16, 2003, Duarte sought and the Alameda County Superior Court granted a temporary restraining order against the student attackers, Freeland and Mbuli. On January 9, 2004, a hearing on injunction was held at the Alameda County Superior Court, which issued a final injunction restraining Freeland and Mbuli (Exh. B, bates 2001, 2013).

23. On or about November 2004, Duarte made a claim with OUSD's risk management office for permanent disability benefits. On or about November 2004, Overlin Zamora, director of risk manage for OUSD, referred Duarte to Standard for his claim for disability benefits. The Risk Management office certified Duarte's disabilities and sent the form to Standard.

24. On December 2004, Duarte filed his claim for permanent disability benefits with Standard pursuant to the terms of the insurance policy. This claim included his diagnoses from his psychiatric and orthopedic health care providers, indicating disability.

25. Between December 2004 and continuing into 2006, Duarte provided Standard with all of the information it requested and rebutted what Duarte felt were unlawful pretexts for denial of benefits. Those pretexts were that the Standard Insurance Company could delay payment pending the outcome of the worker's compensation matter, that payment could be conditioned on Duarte signing a new agreement adding new terms, that payment will be delayed because Duarte was represented by counsel, among other things. Moreover, between December 2004 and into 2006 the Standard Insurance Company wrote to Duarte to send him "amendments" and different policies to claim that Duarte was not entitled to benefits beyond 24 months.

26. On or about January 6, 2005, the Standard Insurance Company wrote to Duarte admitting that he

Exhibit 1

was disabled due to Duarte's Post Traumatic Stress Disorder was subject to a 24 month limitation but claimed that Duarte would be eligible for benefits until age 65 if he was "...disabled from Any Occupation as defined by the Any Occupation Definition of Disability due to his physical condition(s) alone..." The Standard Insurance Company stated that it would continue to review the matter.

27. In that same January 6, 2005 letter, Standard purported to allege an "amendment" to Duarte's policy that limited benefits to 24 months. They attached a copy of that alleged "amendment." This alleged amendment appears to be a generic form, does not contain a title identifying Duarte's policy, has "Oakland Unified School District" typed over it on top indicating a later creation, and it is crooked and appears pasted together. Notably, it reads at line 1, "Effective October 1, 1996..." but at the footer of the document it has a creation date of "90 LTD." The Standard Insurance Company stated that it would continue to review the matter.

28. Once Duarte rebutted by showing the existence of disability based on the physical trauma to the shoulder, Standard switched to a claim that disability from "all work" only means teaching, which for them is a purely psychiatric illness irrespective of symptoms, in order to limit payment to 24 months.

29. On or about January 11, 2005, upon seeing Duarte's diagnoses of physical disability, Standard reversed itself and mischaracterized Duarte's as disability as a mental disability rather than a physical one, "Therefore, the focus of this review will be regarding Duarte's mental impairment from December 4, 2003 to current." The Standard Insurance Company stated that it would continue to review the matter.

30. On January 14, 2005, Duarte informed Standard that Duarte had been approved for State of California Disability Benefits (Exh. C).

-6-

Exhibit 1

31. As stated above, all orthopedists concur that the left shoulder is permanently impinged with vocational disability, most notably Dr. Anthony Matan and Social Security Administration examiner Calvin Pon, MD.

32. On April 18, 2005, Standard wrote to Duarte admitting that he is disabled and entitled to disability benefits (Exh. D). The Standard Insurance Company stated that it would continue to review the matter.

33. On or about April 2005 defendants started sending checks to Duarte, who did not cash them immediately.

34. On April 20, 2005, Standard wrote to Duarte attaching yet another version of an insurance policy with "Printed 6/7/93" typed at the footer and purporting to limit Duarte's benefits to 24 months. This is the **third** time that Standard presented an incorrect policy as being authentic and controlling. The Standard Insurance Company stated that it would continue to review the matter.

35. On or about April 2005 Standard started sending checks to Duarte, who did not cash them immediately.

36. On October 2005, However, Duarte's Qualified Medical Examiner Dr. Joseph Anthony Matan diagnosed Duarte's shoulder impingement as disabling him from physical labor (Exh. E, p. 9).

37. On or about March 2006, Duarte realized that Standard breached the agreement by arbitrarily refusing to pay Duarte his disability insurance benefits until age 65, because he did not receive a check that month. In fact on February 2, 2006, Standard sent Duarte a check for the last time (Exh. F).

38. In 2006, Duarte applied for Social Security benefits. The Social Security Administration sent Duarte to be examined by its own doctors. On March 19, 2007, Morton Felix, PhD, psychologist for the Social Security Administration found that Duarte had <u>physical</u> symptoms[2] The examiner

---

[2]On January 20, 2005, Duarte provided defendants with a detailed explanation of Duarte's Post Traumatic Stress

PLAINTIFF'S COMPLAINT

Exhibit 1

wanted to find out more about the severe beating the claimant received in the a school classroom, but when prodded to talk about it, the <u>claimant shivered and shook and had a very contorted and negative response</u> to the memories of the incident..." "It was clear that the claimant could not think about the incident without severe mental and physical reactions..." (Exh. G, bates 1012).

39. Additionally, on March 27, 2007, Calvin Pon, MD, orthopedist for the Social Security Administration found Duarte to be physically disabled from all lines of physical labor due to the left shoulder impingement (Exh. H, Bates 7004, 7005)(emphasis added).

40. To summarize, the Standard Insurance Company does not contest that Duarte is disabled. The Standard Insurance Company admits that Duarte is psychiatrically disabled. The dispute is whether a) the policy has an ambiguity as to physical injury that causes psychiatric symptoms and psychiatric illness which causes physical symptoms both of which are treated as physical disability in California, and b) Duarte is only psychiatrically disabled or also physically disabled. The Standard Insurance Company paid Duarte disability benefits.

## CAUSES OF ACTION

### 1. BREACH OF CONTRACT

41. Duarte restates and reiterates all of the foregoing paragraphs of this complaint as if set forth in full at this point.

42. All applicable laws and ordinances in existence when the agreement is made become a part thereof as fully as if incorporated by reference. *Calpetro Producers Syndicate v. Woods Co.*, (1929) 206 C. 246, 252, 278.

43. The contract terms provided that Duarte would be entitled disability insurance benefits upon suffering disabling injury or illness and that those benefits would be paid until age 65, and without offset (Exh. A).

---

Disorder symptoms including, "violent illness, vomiting, headaches, and night sweats."

Exhibit 1

44. Duarte did all of the significant things that the contract required him to do including filing a claim for disability benefits.

45. All conditions required for Standard' performance had occurred as Duarte was disabled from not only his but all other lines of work due to his injuries. Those injuries are physical injury to his left shoulder and psychiatric injuries.

46. Standard breached their duties that the contract required.

47. As a result, Duarte suffered harm.

48. Wherefore Duarte prays for Declaratory Relief, Specific Performance; civil penalties; Injunctive relief as this court deems appropriate: prospective and retroactive, cost of suit, and attorney's fees.

## 2. BREACH OF THE IMPLIED COVENANT

## OF GOOD FAITH AND FAIR DEALING

49. Duarte restates and reiterates all of the foregoing paragraphs of this complaint as if set forth in full at this point.

50. The contractual relationship between Duarte and Standard is governed by the California implied covenant of good faith and fair dealing.

51. In acting as described above, Standard wrongfully and unreasonably breached its duty implied in the employment contract to deal fairly and in good faith with Duarte.

52. Standard knew at all material times that because of Duarte's age, health condition, and work experience, that he was extremely vulnerable to substantial harm from the termination of his employment. Standard also knew that at all material times Duarte was in an inherently unequal bargaining position with Standard and had placed trust and confidence in Standard to act fairly and in good faith toward him.

53. As a direct and proximate result of Standard' conduct, Duarte has sustained substantial economic

Exhibit 1

losses, including past and future compensation, and other economic benefits. Duarte has also
sustained loss of financial stability, peace of mind and future security and has suffered
embarrassment, humiliation, mental and emotional distress and discomfort, all to his detriment and
damage in amounts not fully ascertained.

54. In acting as described above, Standard acted oppressively, maliciously, fraudulently and
outrageously towards Duarte, with conscious disregard for his known rights and with the intention
of causing, unjust and cruel hardship to him. In acting in a deliberate, cold, callous and intentional
manner Standard intended to and did injure and annoy Duarte.

55. Duarte requests the assessment of punitive damages against Standard in an amount to punish and
make an example of them.

56. Wherefore Duarte prays for Declaratory Relief, Specific Performance; civil penalties; Injunctive
relief as this court deems appropriate: prospective and retroactive, cost of suit, and attorney's fees.

### 3. BREACH OF THE OBLIGATION OF GOOD FAITH AND FAIR DEALING:

### BAD FAITH INSURER BREACH

**California *Insurance Code* § 790.03(h), California Unfair Claims Practices Act**

57. Duarte incorporates by reference all of the preceding paragraphs by reference.

58. Standard breached the obligation of good faith and fair dealing by unreasonably failing to pay and
delaying payment of insurance benefits.

59. Duarte suffered a loss covered under an insurance policy with Standard (Exh. A).

60. Standard were notified of the loss.

61. Standard unreasonably failed to pay and delayed payment of policy benefits.

62. Duarte was harmed.

63. Standard' unreasonable failure to pay and delay in payment of policy benefits was a substantial

PLAINTIFF'S COMPLAINT

Exhibit 1

factor in causing Duarte's harm.

64. Wherefore Duarte prays for Declaratory Relief, Specific Performance; civil penalties; Injunctive relief as this court deems appropriate: prospective and retroactive, cost of suit, and attorney's fees.

### 4. VIOLATION CAL. CIVIL CODE §51, THE UNRUH ACT

65. Duarte restates and reiterates all of the foregoing paragraphs of this complaint as if set forth in full at this point.

66. Duarte intentionally invokes the protections of the Unruh Act under Civ. Code section 51 (f) in order to resolve any question as to whether Duarte seeks protection of his civil right to be free from disability discrimination under the Americans with Disabilities Act.

67. The conduct of Standard in denying him his disability benefits constitutes interference on the basis of disability with Duarte's right to the "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . " under the ADA. 42 U.S.C. section 12182, subd. (a).

68. But, Standard also violated Duarte's right guaranteed under the ADA to receive the benefits of the services, programs or activities of a public entity which are unrelated to public accommodations and do not derive from the common law.  42 U.S.C. Section 12132. In this case, Standard had a duty to provide those benefits and failed to do so on the basis of Duarte's disabilities.

69. As a result, Duarte suffered harm.

70. Wherefore Duarte prays for Declaratory Relief, Specific Performance; civil penalties; Injunctive relief as this court deems appropriate: prospective and retroactive, cost of suit, and attorney's fees.

### 5. UNFAIR COMPETITION

#### Cal. Business & Professions Code § 17200

71. Duarte hereby incorporate by reference all of the preceding paragraphs as if fully set forth herein.

-11-

Exhibit 1

72. Under the Unruh Act, Civil Code §§51,52 it is unlawful for private individuals to discriminate against Duarte on the basis of her gender, race, national origin, medical condition, and/or disability. The Unruh is a strict liability statute.

73. All applicable laws and ordinances in existence when the agreement is made become a part thereof as fully as if incorporated by reference. Calpetro Producers Syndicate v. Woods Co., (1929) 206 C. 246, 252; 278. The terms in contracts in California are governed by Civil Code §§51, the California Constitution Article 1, §§1, the provisions of which are duties with which the insurer must comply.

74. It is unlawful for private individuals to violate California Constitution, article I §§1, the right to property and happiness. The California Constitution provides for strict liability.

75. Standard' violations of Civil Code §§51, 52, the California Constitution Article 1, §§1 and Ins. Code §790.03(h) constitute per se violations of the Unlawful Business Practice prong of Cal. Bus. Cal. Business & Professions Code §§ 17200, et. Seq.

76. Standard through their agents made the representations that the insurance policy complied with all laws and that Duarte would receive fair non-discriminatory treatment.

77. When Standard made these representations, they had a tendency to deceive and/or had no ground for believing them to be true in that they were not going to provide Duarte with the benefits as described in his policy. Standard' deceptive practices constitute unfair competition under the Fraudulent Acts or Practices prong of Bus. & Prof. Code §17200.

78. Standard' acts of deceiving Duarte, delaying payment of benefits, and misrepresenting the amount of benefits are immoral, unethical, oppressive, unscrupulous, and injurious conduct prohibited the Unfair Act or Practices prong of Bus. & Prof. Code § 17200.

79. Standard repeatedly stated that they would continue to ignore Duarte's physical disabilities, construe contractual ambiguities against him, and would use fabricated insurance policies. As a

-12-

Exhibit 1

result, Duarte is informed and believes that Standard will continue to intimidate, discriminate, and harm her in violation of the above statutory and Constitutional rights.

80. Wherefore Ms. Duarte prays for injunctive relief.

## 6. DECLARATORY AND INJUNCTIVE RELIEF INCLUDING SPECIFIC PERFORMANCE

81. Duarte restates and reiterates all of the foregoing paragraphs of this complaint as if set forth in full at this point.

82. About December 2003, Duarte entered into an agreement. The consideration was reasonable. Duarte performed all covenants required of him by the contract.

83. The conduct of Standard violated California and Federal laws guaranteeing Duarte right to be free from discrimination on the basis of disability.

84. Duarte seeks specific performance for all of the benefits under the contract (Exh. A).

85. In addition, pursuant to California Civil Code § 52(c)(3), Duarte is entitled to seek injunctive and equitable relief, against the person or persons responsible for the conduct, as Duarte's deems necessary to ensure the full enjoyment of the rights described in the contract.

86. Unless and until enjoined by order of this Honorable court, Standard will continue to violate Duarte 's rights as herein alleged, thereby causing Duarte great and irreparable injury in that they these Standard will continue to discriminate against them in violation of the above-enumerated statutes.

87. Duarte has no adequate remedy at law for the injuries suffered and to be suffered in the future in that it is impossible for him to calculate a sum of money damages that will compensate them for the deprivation of their rights as alleged herein.

88. Wherefore Duarte prays for Declaratory Relief, Specific Performance; civil penalties; Injunctive relief as this court deems appropriate: prospective and retroactive, cost of suit, and attorney's fees.

-13-

Exhibit 1

## PRAYER FOR RELIEF

89. Duarte demands a jury trial.

90. Duarte's remedies sought include but are not limited to the following against all Standard:

91. Issue injunctive (specific performance) relief retroactively for disability benefits not paid since February 2, 2006 in the sum of $28, 800 or in an amount that this Court deems just and prospectively in the amount of $1,200 per month starting now. This total is $27, 600.

92. Permanently enjoin Standard from making further misrepresentations.

93. Issue a permanent injunction mandating that all Standard make prompt payment of disability benefits every month on or about the 1ˢᵗ of the month.

94. Declare that Duarte's 2002 insurance policy controls.

95. Declare that Duarte properly presented a claim for disability benefits under that policy.

96. Declare that Duarte is disabled due to cognitive and physical impairment

97. Declare that Duarte is disabled from his own occupation.

98. Declare that Duarte is disabled from his own occupations of teaching, paralegal, and firefighter.

99. Declare that Duarte is disabled from any occupation.

100. Declare that Duarte satisfied the requirements for disability benefits under the "Own Occupation" definition of disability.

101. Declare that Duarte satisfied the requirements for disability benefits under the "Any Occupation" definition of disability.

102. Declare that Duarte's 2002 insurance policy contains an ambiguity between psychiatric manifestations caused by physical injuries and psychiatric illness which cause physical manifestations.

103. Declare that the above ambiguity shall be construed against the drafter. defendant Standard.

Exhibit 1

104. Declare that based on this ambiguity a 24 month benefit limit did not apply to Duarte's physical symptoms including but not limited to convulsions, nausea, retching, vomiting, headaches, and night sweats.

105. Declare that no 24 month benefit limit applies to Duarte's limitations in his impinged left shoulder.

106. Declare that Duarte satisfied the requirements for payment of disability benefits to age 65.

107. Declare that Standard waived the repayment provisions of Duarte's policy.

108. Declare that Standard unlawfully denied Duarte his disability benefits in violation of California law including but not limited to Insurance Code §790 and the Unruh Act.

109. Declare that Standard violated Duarte's right to happiness and property under Article I, §1 of the California Constitution.

110. Declare the proper method for calculating the monthly benefit amount per the terms of the policy: a) $1,200 maximum or b) 66.66% of the first $1,200 ($799.92) +  66.66% of the next $1,200 ($799.92) = $1,599.84 ($799.92 + $799.92= $1599.84.).  Award back due amounts if necessary.

111. Award penalties against Standard under Civil Code §52.

112. Award restitution and disgorgement of profits.

113. Award punitive remedies against Standard as the court deems appropriate.

114. Grant Duarte his attorney's fees and costs arising out of this suit.

115. Grant such other and further relief as the Court deems appropriate including but not limited to damages.

Date: January 31, 2008

_____
JOSE DUARTE

Exhibit 1

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2007

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File Number: 1-14925

# STANCORP FINANCIAL GROUP, INC.
(Exact name of registrant as specified in its charter)

| **Oregon** | **93-1253576** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1100 SW Sixth Avenue, Portland, Oregon, 97204**
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: (971) 321-7000

Securities registered pursuant to Section 12(b) of the Act:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock | New York Stock Exchange |
| Series A Preferred Share Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of the 10-K or any amendment to the Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.
Large accelerated filer ☒   Accelerated filer ☐   Non-accelerated filer ☐   Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of June 29, 2007, was approximately $2.75 billion based upon the closing price of $52.48 on June 29, 2007. For this purpose, directors and executive officers of the registrant are assumed to be affiliates.

As of February 22, 2008, there were 49,011,892 shares of the registrant's common stock, no par value, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement for its 2008 Annual Meeting of Shareholders are incorporated by reference in Parts I and III.

# Exhibit 2

# Part I

As used in this Form 10-K, the terms "StanCorp," "Company," "we," "us" and "our" refer to StanCorp Financial Group, Inc. and its subsidiaries, unless the context otherwise requires.

## AVAILABLE INFORMATION

StanCorp files its annual, quarterly and current reports, proxy statements and other information with the United States Securities and Exchange Commission ("SEC"). You may read and copy any document StanCorp files with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Room 1580, Washington, DC 20549, U.S.A. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330 (or 1-202-551-8090). The SEC maintains an Internet site that contains annual, quarterly and current reports, proxy and information statements and other information regarding issuers that file electronically with the SEC. StanCorp's electronic SEC filings are available to the public at www.sec.gov.

StanCorp's Internet site for investors is www.stancorpfinancial.com/investors. StanCorp publishes its annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, on its Internet site free of charge. StanCorp makes these reports available as soon as reasonably practicable after it electronically files such material with, or furnishes it to, the SEC. StanCorp also makes available on www.stancorpfinancial.com/investors (i) its Corporate Governance Guidelines, (ii) its codes of business ethics (including any waivers therefrom granted to executive officers or directors), and (iii) the charters of the audit, organization and compensation, and nominating and corporate governance committees of its board of directors. These documents are also available in print without charge to any person who requests them by writing or telephoning:

Shareholder Relations Department
StanCorp Financial Group, Inc.
1100 SW Sixth Avenue
Portland, OR 97204
(800) 378-8360

## Item 1. Business

### FORWARD-LOOKING STATEMENTS

Some of the statements contained or incorporated by reference in this Annual Report on Form 10-K, including those relating to the Company's strategy and other statements that are predictive in nature, that depend on or

refer to future events or conditions, or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates," "seeks" and similar expressions, are forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended. These statements are not historical facts but instead represent only management's expectations, estimates and projections regarding future events. Similarly, these statements are not guarantees of future performance and involve uncertainties that are difficult to predict, which may include, but are not limited to, the factors listed in Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Forward-looking Statements" of this Report. As a provider of financial products and services, our results of operations may vary significantly in response to claims experience, economic trends, interest rate changes, investment performance, operating expenses and pricing. Caution should be used when extrapolating historical results or conditions to future periods.

Our actual results and financial condition may differ, perhaps materially, from the anticipated results and financial condition in any such forward-looking statements and, given these uncertainties or circumstances, readers are cautioned not to place undue reliance on such statements. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

### GENERAL

We are a holding company for our insurance and asset management subsidiaries and are headquartered in Portland, Oregon. We are the parent company of Standard Insurance Company, a leading provider of group insurance products and services serving the life and disability insurance needs of employer groups and disability insurance serving the needs of individuals. Our insurance subsidiaries also provide accidental death and dismemberment insurance ("AD&D") and dental insurance. Through our insurance subsidiaries, we have the authority to underwrite insurance products in all 50 states. Our asset management businesses offer investment management services, retirement financial services, individual annuities, group annuity contracts and trust products, full-service 401(k) plans, 457 plans, defined benefit plans, money purchase pension plans, profit sharing plans, 403(b) plans, non-qualified deferred compensation products and services and limited trust services. Our mortgage subsidiary originates and services small, fixed-rate commercial mortgage loans for the investment portfolios of our insurance subsidiaries and for sale to institutional investors.

Exhibit 2

# Part I

## MISSION AND STRATEGY

Our mission is to exceed customers' needs for financial products and services in growing markets where the application of specialized expertise creates potential for superior shareholder returns. Our vision is to lead the financial services industry in integrity, expertise and customer service. We operate in select financial products and services growth markets and seek to compete on expertise, differentiation and customer service, while maintaining a strong financial position.

StanCorp's strategy includes:

- Maintaining strong growth rates in traditional risk acceptance businesses (disability and group life insurance).
- Developing greater diversification by taking advantage of market opportunities, demographic trends and capital synergies.
- Significantly increasing our asset accumulation and asset administration businesses over the next few years.

Our ability to accomplish this strategy is dependent on a number of factors, some of which involve risks or uncertainties. See "Competition" and "Key Factors Affecting Results of Operations" below, Item 1A, "Risk Factors," and Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Forward-looking Statements" of this Report.

## DEVELOPMENT OF STANCORP

StanCorp was incorporated under the laws of Oregon in 1998 as a parent holding company and conducts business through its subsidiaries: Standard Insurance Company ("Standard"); The Standard Life Insurance Company of New York; Standard Retirement Services, Inc. ("Standard Retirement Services"); StanCorp Equities, Inc. ("StanCorp Equities"); StanCorp Mortgage Investors, LLC ("StanCorp Mortgage Investors"); StanCorp Investment Advisers, Inc. ("StanCorp Investment Advisers"); StanCorp Real Estate, LLC ("StanCorp Real Estate"); and StanCorp Trust Company. The Company is based in Portland, Oregon and, through our subsidiaries, has operations throughout the United States.

The Standard is a service mark of StanCorp and its subsidiaries and is used as a brand mark and marketing name by Standard and The Standard Life Insurance Company of New York. We have the authority to underwrite insurance products in all 50 states.

Standard, our largest subsidiary, underwrites group and individual disability insurance and annuity products, group life, AD&D, and dental insurance, and provides retirement plan products. Founded in 1906, Standard is domiciled in Oregon

and licensed in all states except New York, and is licensed in the District of Columbia and the U.S. Territories of Guam and the Virgin Islands.

The Standard Life Insurance Company of New York was organized in 2000 and is licensed to provide group long term and short term disability, life, AD&D and dental insurance in New York.

Effective January 1, 2007, the administration and servicing operations of StanCorp's retirement plans group annuity contracts offered through Standard and for the trust product formerly offered through Invesmart, Inc. ("Invesmart"), which was acquired in July 2006, began operating under the name Standard Retirement Services. Retirement plans products are offered in all fifty states through Standard or Standard Retirement Services.

StanCorp Equities is a limited broker-dealer and member of the Financial Industry Regulatory Authority. StanCorp Equities serves as principal underwriter and distributor for group variable annuity contracts issued by Standard and as the broker of record for certain retirement plans using the trust platform. StanCorp Equities carries no customer accounts but provides supervision and oversight for the distribution of group variable annuity contracts and of the sales activities of all registered representatives employed by StanCorp Equities and its affiliates.

StanCorp Mortgage Investors originates, underwrites and services small, fixed-rate commercial mortgage loans for the investment portfolios of our insurance subsidiaries. StanCorp Mortgage Investors also generates additional fee income from the origination and servicing of commercial mortgage loans participated to institutional investors. StanCorp Mortgage Investors began operations in 1996 and, as of December 31, 2007, was servicing $3.66 billion in commercial mortgage loans for subsidiaries of StanCorp and $1.90 billion in commercial mortgage loans for other institutional investors. The average loan size of the commercial mortgage loans held by the insurance subsidiaries and serviced by StanCorp Mortgage Investors was approximately $0.7 million at December 31, 2007.

StanCorp Investment Advisers is a Securities and Exchange Commission ("SEC") registered investment adviser providing performance analysis, fund selection support, model portfolios and other investment advisory and investment management services to its retirement plans clients, individual investors and subsidiaries of StanCorp.

StanCorp Real Estate is a property management company that owns and manages our Hillsboro, Oregon home office properties and other investment properties and manages our Portland, Oregon home office properties.

Exhibit 2



# About The Standard

## Executive Bios

### Eric Parsons

**Chairman, President and Chief Executive Officer**
**StanCorp Financial Group, Inc., Standard Insurance Company**



Eric Parsons was elected chief executive officer of StanCorp Financial Group, Inc. and Standard Insurance Company in 2003 following service as president and chief operating officer. He was appointed to StanCorp's board of directors in August 2002 and elected chairman in May 2004.

Parsons joined Standard Insurance Company in 1968 and has served The Standard in numerous roles including senior vice president and chief financial officer; vice president, Investments; and president of the company's Mortgage and Real Estate subsidiaries.

He is a graduate of Lewis & Clark College, Northwestern University's School of Mortgage Banking and is a Fellow in the Life Management Institute.

Parsons serves on the board of directors of the Oregon Business Council, Portland Art Museum and Portland Opera. He also serves as vice chair of the board of trustees of the Oregon Health & Science University Foundation and is chairman of the OHSU Cancer Institute Council.

### Kim Ledbetter

**Senior Vice President, Asset Management Group**
**Standard Insurance Company**



Kim Ledbetter was appointed senior vice president of the Asset Management Group in 2006. He is also president of StanCorp Equities, Inc., StanCorp Mortgage Investors, LLC, StanCorp Investment Advisers, StanCorp Real Estate, LLC, Standard Retirement Services and StanCorp Trust Company.

Ledbetter joined The Standard in 1974 as an actuarial student and has held a succession of positions with increasing responsibility. He served as assistant vice president and individual product actuary for the individual insurance division, vice president of Retirement Plans and senior vice president of Individual Insurance and Retirement Plans.

He is a graduate of Claremont McKenna College, is a Chartered Life Underwriter, a member of American Academy of Actuaries and a Fellow in the Society of Actuaries.

Ledbetter is a member of the Board of Trustees for Pacific University in Forest Grove, Oregon and serves on the human resources committee of the United Way of the Columbia-Willamette.

### J. Greg Ness

**Senior Vice President, Insurance Services Group**



Ness joined Standard Insurance Company in 1979 and has held a succession of positions with increasing responsibilities, including vice president of Retirement Plans Sales and Marketing, vice president and corporate secretary, senior vice president of Investments and president of StanCorp Mortage Investors, LLC and StanCorp Investment Advisers.

He is a Phi Beta Kappa graduate of Washington State University, has earned an MBA from Portland State University and holds the LIMRA Leadership Institute Fellow designation from the Life Insurance Marketing and Research Association.

Ness serves on numerous community boards and councils in the Portland area and is past chair of the Stage.



## Mike Winslow

### Senior Vice President and General Counsel
### StanCorp Financial Group, Inc., Standard Insurance Company

Mike Winslow is senior vice president and general counsel of StanCorp Financial Group, Inc. and its primary subsidiary Standard Insurance Company. He has oversight for Corporate Legal, Public Affairs and Corporate Communications as well as the company's strategic planning process.

He formerly served as assistant general counsel and chief compliance officer for PacifiCorp. Prior to that he was assistant general counsel and assistant secretary for PacifiCorp Financial Services, Inc.

A graduate of Indiana University, Winslow earned his JD from Northwestern School of Law of Lewis & Clark College. Winslow is a member of the American Bar Association and the Oregon State Bar Association.



He serves as a director for the Portland Business Alliance and is a member of the Open Meadow Alternative Schools' Sustainability Campaign Board and the Friends of Forest Park Advisory Council.

## David O'Brien

### Senior Vice President, Information Technology
### Standard Insurance Company

David M. O'Brien is the senior vice president of Information Technology. He is responsible for developing and leading the company's information technology strategy to enable the company's business goals. His responsibilities include business systems development and maintenance; program and project management; enterprise architecture and infrastructure. O'Brien joined The Standard in May of 2004 as vice president of Information Technology and in June 2006 was promoted to senior vice president.



Before joining The Standard, O'Brien served as chief information officer for FEI Company. Prior to that he worked for Credence Systems Corporation, where he held a succession of positions with increasing responsibilities, including senior vice president and chief information officer, senior vice president of marketing and senior vice president of engineering. He was a member of the team that helped Credence grow from $1 million to $600 million in revenue.

O'Brien is a graduate of Harvard University and holds a master's in applied physics from Stanford University. He volunteers with Boy Scouts of America.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2005

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File Number: 1-14925

# STANCORP FINANCIAL GROUP, INC.

(Exact name of registrant as specified in its charter)

| Oregon | 93-1253576 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1100 SW Sixth Avenue, Portland, Oregon, 97204**
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: (971) 321-7000

Securities registered pursuant to Section 12(b) of the Act:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock | New York Stock Exchange |
| Series A Preferred Share Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by a check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of the 10-K or any amendment to the Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act).  Large accelerated filer ☒  Accelerated filer ☐  Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes ☐  No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2005, was approximately $2.10 billion based upon the closing price of $38.29 on June 30, 2005. For this purpose, directors and executive officers of the corporation are considered to be affiliates; the aggregate market value of their collective holdings of voting and non-voting common equity has been excluded accordingly.

As of February 24, 2006, there were 54,691,934 shares of the registrant's common stock, no par value, outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement for its 2006 Annual Meeting of Shareholders are incorporated by reference in Parts I and III.

# Exhibit 4

The following table sets forth our investments' gross unrealized losses and fair value, aggregated by investment category and length of time that individual securities have been in a continuous unrealized loss position, at December 31, 2005:

| | At December 31, 2005 | | Less Than 12 Months | | 12 or More Months | |
|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | Number | Amount |
| Unrealized losses: | | | | | | |
| U.S. government and agency bonds | 59 | $ (1.9) | 51 | $ (1.6) | 8 | $ (0.3) |
| Bonds of state and political subdivisions of the U.S. | 29 | (0.7) | 21 | (0.3) | 8 | (0.4) |
| Corporate Bonds | 1,470 | (37.4) | 1,266 | (27.8) | 204 | (9.6) |
| | 1,558 | $ (40.0) | 1,338 | $ (29.7) | 220 | $(10.3) |
| Fair market value of securities with unrealized losses: | | | | | | |
| U.S. government and agency bonds | 59 | $ 98.7 | 51 | $ 89.6 | 8 | $ 9.1 |
| Bonds of states and political subdivisions of the U.S. | 29 | 36.0 | 21 | 26.5 | 8 | 9.5 |
| Corporate Bonds | 1,470 | 1,709.9 | 1,266 | 1,468.2 | 204 | 241.7 |
| | 1,558 | $1,844.6 | 1,338 | $1,584.3 | 220 | $260.3 |

The following table sets forth our investments' gross unrealized losses and fair value, aggregated by investment category and length of time that individual securities have been in a continuous unrealized loss position, at December 31, 2004:

| | At December 31, 2004 | | Less Than 12 Months | | 12 or More Months | |
|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | Number | Amount |
| Unrealized losses: | | | | | | |
| U.S. government and agency bonds | 15 | $ (0.2) | 15 | $ (0.2) | — | $ — |
| Bonds of state and political subdivisions of the U.S. | 11 | (0.4) | 11 | (0.4) | — | — |
| Corporate Bonds | 441 | (8.3) | 436 | (8.1) | 5 | (0.2) |
| | 467 | $ (8.9) | 462 | $ (8.7) | 5 | $(0.2) |
| Fair market value of securities with unrealized losses: | | | | | | |
| U.S. government and agency bonds | 15 | $ 20.0 | 15 | $ 20.0 | — | $ — |
| Bonds of states and political subdivisions of the U.S. | 11 | 16.2 | 11 | 16.2 | — | — |
| Corporate Bonds | 441 | 476.5 | 436 | 474.4 | 5 | 2.1 |
| | 467 | $512.7 | 462 | $510.6 | 5 | $ 2.1 |

## 6. COMMERCIAL MORTGAGE LOANS, NET

The Company underwrites mortgage loans on commercial property and in addition to real estate collateral, requires either partial or full recourse on most loans. Although the Company underwrites commercial mortgage loans throughout the United States, commercial mortgage loans in California represent a concentration of credit risk. The following table sets forth the geographic concentration of commercial mortgage loans at December 31:

| (Dollars in millions) | 2005 | | 2004 | |
|---|---|---|---|---|
| | Amount | Percent | Amount | Percent |
| California | $1,011.0 | 31.2% | $ 981.6 | 33.3% |
| Texas | 316.3 | 9.7 | 274.2 | 9.3 |
| Florida | 126.4 | 3.9 | 110.2 | 3.7 |
| Georgia | 109.2 | 3.4 | 87.6 | 3.0 |
| Oregon | 97.7 | 3.0 | 118.3 | 4.0 |
| Other | 1,583.1 | 48.8 | 1,376.3 | 46.7 |
| Total commercial mortgage loans | $3,243.7 | 100.0% | $2,948.2 | 100.0% |

Commercial mortgage loans in California account for 31.2% of our commercial mortgage loan portfolio at

December 31, 2005. Due to this concentration, we are exposed to potential losses resulting from the risk of an economic downturn in California as well as to certain catastrophes, such as earthquakes, that may affect the region. Although we diversify our commercial mortgage loan portfolio within California by both location and type of property in an effort to reduce earthquake exposure, such diversification may not eliminate the risk of such losses. We do not require earthquake insurance for properties on which we make commercial mortgage loans, but do consider the potential for earthquake loss based upon seismic surveys and structural information specific to each property when new loans are underwritten.

Historically, the delinquency rate of our California-based commercial mortgage loans has been substantially below the industry average and consistent with our experience in other states. However, if economic conditions in California decline, we could experience a higher delinquency rate on the portion of our commercial mortgage loan portfolio located in California, which could have a material adverse effect on

Exhibit 4

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-K

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2004

or

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File Number: 1-14925

# STANCORP FINANCIAL GROUP, INC.

(Exact name of registrant as specified in its charter)

| Oregon | 93-1253576 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1100 SW Sixth Avenue, Portland, Oregon, 97204**
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: (503) 321-7000

Securities registered pursuant to Section 12(b) of the Act:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock | New York Stock Exchange |
| Series A Preferred Share Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of the 10-K or any amendment to the Form 10-K. ☐

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Securities Exchange Act of 1934).  Yes ☒   No ☐

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2004, was approximately $1.88 billion based upon the closing price of $67.00 on June 30, 2004. For this purpose, directors and executive officers of the corporation are considered to be affiliates; the aggregate market value of their collective holdings of voting and non-voting common equity has been excluded accordingly.

As of February 25, 2005, there were 28,438,972 shares of the Registrant's common stock, no par value, outstanding.

#### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's definitive Proxy Statement for its 2005 Annual Meeting of Shareholders are incorporated by reference in Parts I and III.

# Exhibit 4

The following table sets forth our investments' gross unrealized losses and fair value, aggregated by investment category and length of time that individual securities have been in a continuous unrealized loss position, at December 31, 2004:

| | At December 31, 2004 | | Aging Less than 12 months | | 12 or more months | |
|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | Number | Amount |
| Unrealized losses: | | | | | | |
| U.S. government and agency bonds | 15 | $ (0.2) | 15 | $ (0.2) | — | $ — |
| Bonds of states and political subdivisions of the U.S. | 11 | (0.4) | 11 | (0.4) | — | — |
| Corporate Bonds | 441 | (8.3) | 436 | (8.1) | 5 | (0.2) |
| | 467 | $ (8.9) | 462 | $ (8.7) | 5 | $(0.2) |
| Fair market value of securities with unrealized losses: | | | | | | |
| U.S. government and agency bonds | 15 | $ 20.0 | 15 | $ 20.0 | — | $ — |
| Bonds of states and political subdivisions of the U.S. | 11 | 16.2 | 11 | 16.2 | — | — |
| Corporate Bonds | 441 | 476.5 | 436 | 474.4 | 5 | 2.1 |
| | 467 | $512.7 | 462 | $510.6 | 5 | $ 2.1 |

## 6. COMMERCIAL MORTGAGE LOANS, NET

The Company underwrites mortgage loans on commercial property and in addition to real estate collateral, requires either partial or full recourse on most loans. Although the Company underwrites commercial mortgage loans throughout the United States, commercial mortgage loans in California represent a concentration of credit risk. The following table sets forth the geographic concentration of commercial mortgage loans at December 31:

| | 2004 | | 2003 | |
|---|---|---|---|---|
| (Dollars in millions) | Amount | Percent | Amount | Percent |
| California | $ 981.6 | 33.3% | $ 858.3 | 37.0% |
| Texas | 274.2 | 9.3 | 195.7 | 8.4 |
| Oregon | 118.3 | 4.0 | 113.0 | 4.9 |
| Florida | 110.2 | 3.7 | 106.6 | 4.6 |
| Other | 1,463.9 | 49.7 | 1,046.2 | 45.1 |
| Total commercial mortgage loans | $2,948.2 | 100.0% | $2,319.8 | 100.0% |

Commercial mortgage loans in California account for 33.3% of our commercial mortgage loan portfolio at December 31, 2004. Due to this concentration, we are exposed to potential losses resulting from the risk of an economic downturn in California as well as to certain catastrophes, such as earthquakes, that may affect the region. Although we diversify our commercial mortgage loan portfolio within California by both location and type of property in an effort to reduce earthquake exposure, such diversification may not eliminate the risk of such losses. We do not require earthquake insurance for properties on which we make commercial mortgage loans, but do consider the potential for earthquake loss based upon seismic surveys and structural information specific to each property when new loans are underwritten.

Historically, the delinquency rate of our California-based commercial mortgage loans has been substantially below the industry average and consistent with our experience in other states. However, if economic conditions in California worsen, we could experience a higher delinquency rate on the portion of our commercial mortgage loan portfolio located in California, which could have a material adverse effect on the Company's business, financial position, results of operations or cash flows.

The commercial mortgage loan valuation allowance is estimated based on evaluating known and inherent risks in the loan portfolio. The allowance is based on management's analysis of factors including changes in the size and composition of the loan portfolio, actual loan loss experience, economic conditions, and individual loan analysis. A loan is considered impaired when it is probable that the Company will be unable to collect all amounts due, including principal and interest. Loan impairment is measured using discounted cash flows except when the current fair value, reduced by costs to sell, is determinable. Loans that are deemed uncollectible are written off against the allowance, and recoveries, if any, are credited to the allowance.

There were no commercial mortgage loans foreclosed and transferred to real estate during 2004. Commercial mortgage loans foreclosed and transferred to real estate were $1.6 million for 2003. There was no charge against the valuation allowance for the foreclosure in 2003. At December 31, 2004, we had commercial mortgage loans totaling $7.5 million that were more than sixty days delinquent and in the process of foreclosure, most of which have been reinstated since year end. We do not anticipate losses on these mortgages should they proceed through foreclosure. There were no

Exhibit 4          StanCorp Financial Group, Inc. 45

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2003

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File Number: 1-14925

# STANCORP FINANCIAL GROUP, INC.
(Exact name of registrant as specified in its charter)

| Oregon | 93-1253576 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

1100 SW Sixth Avenue, Portland, Oregon, 97204
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: (503) 321-7000

Securities registered pursuant to Section 12(b) of the Act:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| Common Stock | New York Stock Exchange |
| Series A Preferred Share Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of the 10-K or any amendment to the Form 10-K. ☐

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Securities Exchange Act of 1934). Yes ☒ No ☐

The aggregate market value of the voting stock held by non-affiliates of the registrant as of June 30, 2003, was approximately $1.52 billion based upon the closing price of $52.22 on June 30, 2003.

As of February 27, 2004, there were 29,315,167 shares of the Registrant's common stock, no par value, outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Proxy Statement dated March 26, 2004 in connection with the 2004 Annual Meeting of Shareholders are incorporated by reference in Part III.

# Exhibit 4

Actual maturities may differ from contractual maturities because borrowers may have the right to call or prepay obligations. Callable bonds represent 1.85%, or $83.7 million, of our fixed maturity securities.

The following table sets forth net investment income summarized by type of investment for the years ended December 31:

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| Investment securities: | | | |
| Available-for-sale | | | |
| Trading | $253.8 | $198.8 | $174.3 |
| Commercial mortgage loans | — | — | 0.6 |
| Real estate | 189.9 | 177.7 | 176.5 |
| Policy loans | 4.6 | 6.0 | 7.3 |
| Other | 0.3 | 0.4 | 0.5 |
| | 2.3 | 11.7 | 5.3 |
| Gross investment income | 450.9 | 394.6 | 364.5 |
| Investment expenses | (9.1) | (9.5) | (11.9) |
| Net investment income | $441.8 | $385.1 | $352.6 |

The following table sets forth capital gains (losses) for the years ended December 31:

| (In millions) | 2003 | 2002 | 2001 |
|---|---|---|---|
| Gains: | | | |
| Investment securities available-for-sale | | | |
| Commercial mortgage loans | $12.3 | $ 3.1 | $ 8.7 |
| Real estate | 1.3 | 13.2 | 2.4 |
| | 1.9 | 1.1 | 2.1 |
| Gross capital gains | 15.5 | 17.4 | 13.2 |
| Losses: | | | |
| Investment securities available-for-sale | | | |
| Real estate | (6.2) | (37.0) | (12.7) |
| | — | (0.1) | (0.5) |
| Gross capital losses | (6.2) | (37.1) | (13.2) |
| Net capital gains (losses) | $ 9.3 | $(19.7) | $ — |

Securities deposited for the benefit of policyholders in various states, in accordance with state regulations, amounted to $6.3 million and $5.1 million at December 31, 2003 and 2002, respectively.

The following table sets forth our investments' gross unrealized losses and fair value, aggregated by investment category and length of time that individual securities have been in a continuous unrealized loss position, at December 31, 2003:

| | | Aging | |
|---|---|---|---|
| (In millions) | December 31, 2003 | Less than 12 months | 12 or more months |
| Debt securities: | | | |
| Aggregate unrealized losses | $(9.8) | $(9.3) | $(0.5) |
| Aggregate FMV of securities with unrealized losses | 526.2 | 514.9 | 11.3 |

A permanent impairment is recognized on a security if its market value falls below 80% of its book value for 6 months or longer, and/or it is determined that the value will not recover. During the 6 month period, or as long as the holding is valued below 80% of its book value, the holding is watched for potential permanent impairment. At December 31, 2003, we held two issues that had market values below 80% of their book values. One is secured by assets whose value exceeds the value of the debt issue and the other is newly acquired. These are both expected to fully recover, and therefore have not been permanently impaired.

## 6. Commercial Mortgage Loans, Net

The Company underwrites commercial mortgage loans and requires collateral on either a partial or full recourse basis. Although the Company underwrites commercial mortgage loans throughout the United States, commercial mortgage loans in California represent a concentration of credit risk. The following table sets forth the geographic concentration of commercial mortgage loans at December 31:

| (Dollars in millions) | 2003 | | 2002 | |
|---|---|---|---|---|
| | Amount | Percent | Amount | Percent |
| California | $ 858.3 | 37.0% | $ 766.7 | 38.6% |
| Texas | 195.7 | 8.4 | 157.9 | 7.9 |
| Oregon | 113.0 | 4.9 | 112.5 | 5.7 |
| Florida | 106.6 | 4.6 | 95.7 | 4.8 |
| Other | 1,046.2 | 45.1 | 856.3 | 43.0 |
| Total commercial mortgage loans | $2,319.8 | 100.0% | $1,989.1 | 100.0% |

The commercial mortgage loan valuation allowance is estimated based on evaluating known and inherent risks in the loan portfolio. The allowance is based on management's analysis of factors including changes in the size and composition of the loan portfolio, actual loan loss experience, economic conditions, and individual loan analysis. A loan is considered impaired when it is probable that the Company will be unable to collect all amounts due, including principal and interest. Loan impairment is measured using discounted cash flows except when the current fair value, reduced by costs to sell, is determinable. Loans that are deemed uncollectible are written off against the allowance, and recoveries, if any, are credited to the allowance. Commercial mortgage loans foreclosed and transferred to real estate were $1.6 million for 2003. There was no charge against the valuation allowance for the foreclosure in 2003. There were no commercial mortgage loans foreclosed and transferred to real estate in 2002. There were no commercial mortgage loans more than 60 days delinquent or in the process of foreclosure at December 31, 2003 and 2002.

StanCorp Financial

# Exhibit 4

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2002

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File Number: 1-14925

# STANCORP FINANCIAL GROUP, INC.

(Exact name of registrant as specified in its charter)

| Oregon | 93-1253576 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

1100 SW Sixth Avenue, Portland, Oregon, 97204
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: (503) 321-7000

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock | New York Stock Exchange |
| Series A Preferred Share Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of the 10-K or any amendment to the Form 10-K. ☐

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Securities Exchange Act of 1934). Yes ☒ No ☐

The aggregate market value of the voting stock held by non-affiliates of the registrant as of June 28, 2002, was approximately $1.65 billion based upon the closing price of $55.50 on June 28, 2002.

As of March 4, 2003, there were 29,066,984 shares of the Registrant's common stock, no par value, outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Proxy Statement dated March 28, 2003 in connection with the 2003 Annual Meeting of Shareholders are incorporated by reference in Part III.

# Exhibit 4

## 6. Commercial Mortgage Loans, Net

Although the Company underwrites commercial mortgages throughout the United States, commercial mortgage loans in California represent a concentration of credit risk. The Company requires commercial mortgage collateral and underwrites loans on either a partial or full recourse basis. The geographic concentration of commercial mortgage loans was as follows at December 31:

| (Dollars in millions) | 2002 | | 2001 | |
|---|---|---|---|---|
| | Amount | Percent | Amount | Percent |
| California | $ 766.7 | 38.6% | $ 815.5 | 40.7% |
| Texas | 157.9 | 7.9 | 157.9 | 7.9 |
| Oregon | 112.5 | 5.7 | 141.0 | 7.0 |
| Florida | 95.7 | 4.8 | 76.5 | 3.8 |
| Other | 856.3 | 43.0 | 812.3 | 40.6 |
| Total commercial mortgage loans | $1,989.1 | 100.0% | $2,003.0 | 100.0% |

The commercial mortgage loan valuation allowance is estimated based on evaluating known and inherent risks in the loan portfolio. The allowance is based on management's analysis of factors including changes in the size and composition of the loan portfolio, actual loan loss experience, economic conditions, and individual loan analysis. A loan is considered impaired when it is probable that the Company will be unable to collect all amounts due, including principal and interest. Loan impairment is measured using discounted cash flows except when the current fair value, reduced by costs to sell, is determinable. Loans that are deemed uncollectible are written off against the allowance, and recoveries, if any, are credited to the allowance. There were no commercial mortgage loans foreclosed and transferred to real estate in 2002. Commercial mortgage loans foreclosed and transferred to real estate were $1.2 million for 2001. There were no commercial mortgage loans delinquent or in the process of foreclosure at the end of 2002, 2001 and 2000.

The following table sets forth commercial mortgage loan valuation and allowance provisions for the years ended December 31:

| (In millions) | 2002 | 2001 | 2000 |
|---|---|---|---|
| Balance at beginning of the year | $3.6 | $4.4 | $4.1 |
| Provision (recapture) | 0.4 | (0.7) | 0.3 |
| Net amount written off | — | (0.1) | — |
| Balance at end of the year | $4.0 | $3.6 | $4.4 |

## 7. Liability for Unpaid Claims, Claims Adjustment Expenses and Other Policyholder Funds

Liability for unpaid claims, claims adjustment expenses and other policyholder funds include liabilities for insurance offered on products such as group long term and short term disability, individual disability, group dental, and group accidental death and dismemberment. The liability for unpaid claims and claim adjustment expenses are included in future policy benefits and claims in the consolidated balance sheets. The change in the liabilities for unpaid claims and claim adjustment expenses was as follows for the years ended December 31:

| (In millions) | 2002 | 2001 | 2000 |
|---|---|---|---|
| Balance, beginning of year | $1,919.5 | $1,751.9 | $1,232.6 |
| Liabilities acquired | 623.9 | — | — |
| Less: reinsurance recoverable | (2.8) | (3.3) | (1.6) |
| Net balance, beginning of year | 2,540.6 | 1,748.6 | 1,231.0 |
| Incurred related to: | | | |
| Current year | 795.7 | 686.0 | 954.7 |
| Prior years | (0.6) | 46.3 | 1.4 |
| Total incurred | 795.1 | 732.3 | 956.1 |
| Paid related to: | | | |
| Current year | (232.2) | (203.5) | (165.3) |
| Prior years | (401.3) | (360.7) | (273.2) |
| Total paid | (633.5) | (564.2) | (438.5) |
| Net balance, end of year | 2,702.2 | 1,916.7 | 1,748.6 |
| Plus: reinsurance recoverable | 2.9 | 2.6 | 3.3 |
| Balance, end of year | $2,705.1 | $1,919.3 | $1,751.9 |

Other policyholder funds at December 31, 2002 and 2001 included $710.5 million and $676.9 million, respectively, of employer-sponsored defined contribution and benefit plans deposits and $655.5 million and $555.4 million, respectively, of individual deferred annuity deposits.

## 8. Long-term Debt

The following table sets forth the Company's long-term debt at December 31:

| (In millions) | 2002 | 2001 |
|---|---|---|
| Long-term debt: | | |
| Senior notes | $250.0 | $ — |
| Debt issuance costs | (5.8) | — |
| Other long term borrowings | 9.0 | 9.1 |
| Total long term debt | $255.2 | $9.1 |

Exhibit 4

1  Victor A. Segovia, Esq. Bar No. 146576
   The Segovia Law Office
2  712 Bancroft Road, Number 268
   Walnut Creek, CA 94598
3  (925) 674-0185; (925) 674-0165 fax

4  For Plaintiff Jose Duarte

5              IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7  JOSE DUARTE                          CASE NO: CV 08-03021 JSW

8       Plaintiff,                      Hearing: August 29, 2008
                                        Time: 9:00 AM
   vs.                                  Courtroom 2, 17th Floor
9                                       450 Golden Gate Avenue
   THE STANDARD INSURANCE               San Francisco, California
10 COMPANY, a subdivision of STANCORP,
   and DOES 1 THROUGH 50,
11      Defendants

12 __DUARTE CERTIFICATE OF SERVICE ON REMAND AND STRIKE:__

13 ALL PARTIES RECEIVE SERVICE BY ELECTRONIC MEANS THROUGH THE
   COURT'S ECF SYSTEM.  UNDERSIGN IS NOT AWARE OF ANY OTHER
14 PARTY REQUIRING SERVICE BY OTHER MEANS.
          On the date below, UNDERSIGN CAUSED TO BE SERVED:
15
   __DUARTE MOTION FOR REMAND; and__
16 __DUARTE MOTION TO STRIKE DEFENDANTS' DECLARATION IN__
   __SUPPORT OF REMOVAL__
17
   I certify the foregoing is true and correct and that this was executed in Walnut Creek,
18 California on:

19 July 21, 2008              The Segovia Law Office
                              /s/ Victor A. Segovia
20                            Counsel to Plaintiff

21 Service List:

22 | Standard Insurance Company | Katherine Ritchey |
   |                            | Jones Day |
   |                            | 555 California Street, Floor 26 |
23 |                            | San Francisco, CA 94104 |

24

25

26

27

28

- 1 –

DUARTE CERTIFICATE OF SERVICE ON REMAND AND STRIKE: D' Motion Remand & Strike Cert. Service.doc

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA 94598