1  Victor A. Segovia, Esq. Bar No. 146576
   The Segovia Law Office
2  712 Bancroft Road, Number 268
   Walnut Creek, CA 94598
3  (925) 674-0185; (925) 674-0165 fax

4  For Duarte José Duarte

5

6

7              IN THE UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9  JOSE DUARTE                          CASE NO: CV 08-03021 JSW
          Duarte,
10                                       Hearing: August 29, 2008
   vs.                                   Time: 9:00 AM
11                                       Courtroom 2, 17th Floor
   THE STANDARD INSURANCE               450 Golden Gate Avenue
12 COMPANY, a subdivision of STANCORP,   San Francisco, California
   and DOES 1 THROUGH 50,
13        Defendants

14              **DUARTE SECOND REPLY TO**
         **OPPOSITION TO STRIKE AND REMAND**

15 Mr. JOSE DUARTE objected to and moved to strike STANDARD INSURANCE

16 COMPANY's (SIC) declaration in support of removal.  Duarte also motioned for

17 remand based upon the lack of diversity of citizenship of the parties.  SIC has

18 corrected whatever mishap plagued its moving papers and now it appears to oppose

19 both motions and among other things proffers new and different declarations.

20 Essentially, SIC wants a second bite at the apple.

21         Further, Duarte notes an odd discovery development. SIC unlawfully issued

22 requests for admissions. Duarte properly declined to respond noting that formal

23 discovery has not yet opened under Federal Rule of Civil Procedure 26. SIC

24 nevertheless seeks to reap *some* benefit from the unlawful discovery by commenting

25 upon and producing the illegal discovery repartee.  Duarte maintains it is improper for

26 SIC to issue or otherwise benefit from *any* illegal discovery.

27         Duarte replies.

28                      **ARGUMENT**

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

DUARTE REPLY TO OPPOSITION TO STRIKE AND REMAND· D' ReplyII.doc

# I.    ORIGINAL DECLARATION LACKS SUBSTANCE

SIC relies upon *Piazza v. EMPI, Inc*., 2008 U.S. Dist. Lexis 28136, (E.D. Cal. February 28, 2008) for the proposition that supplemental declarations are permitted when the originals are "defective in form." However, SIC's initial declaration is not defective in form but rather substance because it is down right inadmissible in every sense of the word.

With no offense to Ms. Rebecca J. Jeffrey personally, she is just not capable of testifying from firsthand knowledge about the financial affairs of the company and nothing SIC says in its opposition really changes this. She is not a proper witness.

And, the business records exception Federal Rule of Evidence 803(6) that SIC relies upon now does not apply because Jeffrey never examined a single business record! Jeffrey admits, "For the facts based on information and belief… *I gather information from individuals within the company with such knowledge*." Declaration of Rebecca J. Jeffrey In Support of SIC's Notice of Removal at 1:¶2. This is multiple levels of hearsay.

Moreover, the business records exception requires further declarations to the effect of when the document was created, it was created in the ordinary course of business by a responsible person knowledgeable about the facts therein and required to be accurate. Nothing of the sort appears in Jeffrey's declaration, or in the new declarations for that matter.

Jeffrey's declaration lacks substance of any kind because it is inadmissible and she has no firsthand knowledge. Hence supplanting new and different declarations is merely taking another bite of the apple.

# II.    THE COURT MUST MAKE AN INDEPENDENT DETERMINATION OF VALUE OF ITEMS PRAYED

SIC and its parent Stancorp concede that the Court must make an independent determination of the value of any potential prayer for punitive damages, attorney's fees, costs, and/or restitution. Duarte discussed this issue in detail in his motion to

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

DUARTE REPLY TO OPPOSITION TO STRIKE AND REMAND: D' ReplyII.doc

1    remand.  The Court must determine the likelihood of recovery for each item of

2    damages prayed and what value it may have, while avoiding enunciating a decision

3    pre-judging either party's case.

4         Duarte did not attach a value to each of the items prayed because they are

5    uncertain.  However, Duarte did cite $28,800 in his Complaint at ¶91 as the amount in

6    controversy.  SIC seems to ignore this claiming the amount in controversy is blank!

7    SIC Opposition at page 6 line 20.  But if this were true for argument sake, the Court

8    would be permitted to turn to other documents to make an independent determination

9    of the amount in controversy. "If damages are not clearly specified in the pleadings,

10   the court may rely upon a variety of documents, including written settlement

11   demands…. Settlement letters are 'relevant evidence of the amount in controversy if it

12   appears to reflect a reasonable estimate of the plaintiff's claim.'" *Arellano v. Home*

13   *Depot U.S.A., Inc.,* 245 F.Supp.2d 1102, 1106, 1108 (S.D.Cal.2003).)

14        Accepting SIC's non-existent amounts in controversy claim, Duarte proffers a

15   settlement letter repartee indicating a demand to settle for $28,800 and $1,200 going

16   forward to the president of *Stancorp* but to which *SIC* replied.  Exhibit 1 at page two

17   penult paragraph.   Thus, the amount in controversy is $28,800 in arrears and $1,200

18   per month going forward as of the date of commencement.

19        If Duarte prevailed today, the SIC and Stancorp would only be liable for $1,200

20   per month and $28,800 in arrears as of February 1, 2008, the date suit was filed.

21   Therefore, the Duarte's amount in controversy does not meet the statutory minimum

22   for diversity.

23        Further, in attempting to show that the amount in controversy exceeds $75,000,

24   the SIC has underlined the very real probability that Duarte will prevail in his bad faith

25   breach and Business and Professions Code section 17200 claims, entitling him to

26   punitive damages, restitution, and disgorgement of profits.  By nature, bad faith breach

27   under California Insurance Code § 790.03(h) and the unfairness prong of Business and

28   Professions Code section 17200 apply to the unfairness of Stancorp's insurance tactics

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

in denying Duarte's benefits to age 65 by ignoring the physical beating that caused his PTSD with its physical symptoms and by ignoring that he is disabled under the "any occupation" definition of disabled.  It is unfair for the Stancorp to try to hide behind the shell SIC.  It is unfair for Duarte to have his choice of situs for litigation taken from him.  Duarte did not reach out across state lines to contract with the SIC and Stancorp. His employer retained the Stancorp.   The Stancorp and SIC reached out across state lines to make a buck on employees like Duarte.  Duarte and millions of employees like him should not have their right to litigate a local contract in a local court taken from them based on the location of the SIC's furniture and art work as claimed by a paralegal's declaration in support of SIC's removal to federal court.

III.    A WHOLLY OWNED SUBSIDIARY TAKES ON THE CITIZENSHIP OF THE PARENT CORPORATION

As a wholly owned subsidiary of Stancorp, SIC takes on the citizenship of its parent. "[A]s wholly owned subsidiaries of Choice One, each of the L.L.C. plaintiffs is deemed to be a citizen of Delaware and New York, the states of which their owner is a citizen."  See, e.g., J*ohnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir.2006)("We therefore join our sister circuits and hold that, like a partnership, an LLC is a citizen of every state of which its owners/members are citizens.")." 495 F.Supp.2d 219, 224 (D. Mass 2007).

Being wholly owned by a parent company is the predominant fact emphasized in the subsidiary cases. Thusly SIC and Stancorp are one and the same for diversity of citizenship analysis.

*One Communications* is not an alter ego case as urged by SIC.  *One Communications* is purely parent-subsidiary case, wherein ownership by the parent company is the controlling issue.[1]  Here, SIC does not dispute it is a wholly owned subsidiary of Stancorp.  And Stancorp's financial filings to the Security Exchange Commission indicate that SIC exists solely as an income-generating segment within

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

1  the Stancorp and that SIC is entirely controlled by the Stancorp's board of directors

2  and executives (Duarte Remand Motion).  There is no evidence that the SIC acts as a

3  corporation independent of the Stancorp.  In fact SIC's own financial reports are held

4  by Stancorp and are made public on the Stancorp website[2].  SIC financial statement

5  claims a cloud upon its financial outlook posed by the concentration of risk in its

6  mortgage operations and land holdings in California. Exhibit 2, SIC Financial

7  Statement page 2(19.10 of actual report) at ¶16.B. Note also that SIC's financial

8  statement cites assets of Stancorp and uses them to notice possible impending high risk

9  exposure in California due to mortgage loans.[3] The merging and referencing of each

10  others assets and noting high risk in California there from to SIC, makes each an alter

11  ego of the other.  Exhibit 2, SIC Financial Statement page 19.10 at ¶16.B.

12       SIC is, therefore, a citizen of California for diversity purposes through its parent

13  Stancorp and there is no evidence to support the SIC's claim that it is an entity

14  independent of the owning corporation.

15            a.  Alter Ego Theory Indicates SIC Should Take The Citizenship Of Its
                  Parent Stancorp And Favors Remand To A California Court

16
17  SIC claims only California law controls the alter ego analysis, but then cites Texas

18  cases like *Sapic v. Govt of Turkm* 345 F.3d 347 (5th Cir. 2003).  If SIC is purely an

19  Oregon corporation, why would Oregon, Texas, or Federal law not be just as valid if

20  not more so than California law in determining alter ego for diversity purposes sake?[4]

21  SIC only cites conclusory and contradictory rules without offering any factual

22  reasoning or an explanation of the contours of alter ego theory.  At page 10, footnote 5,

23  SIC seems to say that there are multiple alter ego tests.  Regardless, SIC and Stancorp

24  are one and the same under all of them.

25
26  [2] http://phx.corporate-ir.net/phoenix.zhtml?c=72431&p=irol-reportStatutory.
   [3] As strictly an insurance company, SIC, itself, does not sell or otherwise trade in
27  mortgage loans.
   [4]   For example, *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 422-24
28  (9th Cir. 1977) is an Oregon case.

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA 94598

b.  Under The Multiple Factor Test SIC Is The Alter Ego Of The Stancorp

*Powers v. Fox Television* 907 F.Supp 719 (SDNY 1995) provides that a subsidiary

corporation is the alter ego of the parent company if certain factors are satisfied.

Plaintiff need not satisfy all of the facts to show an alter ego relationship exists to

warrant remand based on the citizenship of the parent company. Those factors include:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e. issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own. *Id.* at 724-725

Factors 1, 2, 4, 5, 6, 7, 8, 9, and 10 favor establishing SIC as the alter-ego of Stancorp.

SIC does not issue stock, does not elect it's own directors (the Stancorp's directors

entirely run SIC (Duarte Motion Remand Exhibit 2)) and does not keep separate

records.  In fact whatever records SIC has are entirely held and controlled by the

Stancorp.

The Stancorp underwrites all of its insurance activities because SIC has no

capital:

> The Standard is a service mark of StanCorp and its subsidiaries and is used as a brand mark and marketing name by Standard and The Standard Life Insurance Company of New York. We have the authority to underwrite insurance products in all 50 states. Exhibit 2 to Duarte Remand Motion at p.3, 4.

The Stancorp reference long-term disability reserves of SIC and therefore controls the

reserves, the reinvestment of reserve money, and the use of assets from other segments

to underwrite and guarantee that the insurance benefits under the policies are paid out:

> A substantial portion of our insurance subsidiaries' policy liabilities result from long term disability reserves that have proven to be very stable over time, and annuity products on which interest rates can be adjusted periodically, subject to minimum interest rate guarantees. Policyholders or claimants may not withdraw funds from the large block of disability reserves. Instead, claim payments are issued monthly over periods that may extend for many years. Holding these stable long-term reserves

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

makes it possible to allocate a significant portion of invested assets to long-term fixed-rate investments, including commercial mortgage loans. The ability to allocate a significant portion of investments to commercial mortgage loans, combined with StanCorp Mortgage Investors' unique expertise with respect to its market niche for fixed-rate commercial mortgage loans, allows us to enhance the yield on the overall investment portfolio beyond that available through fixed maturity securities with an equivalent risk profile. See Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations— Liquidity and Capital Resources—Investing Cash Flows" and Item 8, "Financial Statements and Supplementary Data— Notes to Consolidated Financial Statements."

Stancorp holds the purse strings for SIC, which is basically a shell insurance corporation.

SIC is not treated as an independent profit center but rather a core profit source for Stancorp or "segment" which the Stancorp uses to determine and pay out dividends. Duarte Remand Motion.

Also, in its annual report, SIC claims that its future profitability is determined by its mortgages and landholdings in California in "INFORMATION ABOUT FINANCIAL INSTRUMENTS WITH OFF-BALANCE SHEET RISK AND FINANCIAL INSTRUMENTS WITH CONCENTRATIONS OF CREDIT RISK":

Commercial mortgage loans in California represent a concentration of credit risk at 30.2% of our commercial mortgage loan portfolio at December 31, 2007. Due to this concentration, we are exposed to potential losses resulting from the risk of an economic downturn in California as well as to certain catastrophes, such as earthquakes, that may affect the region. Although we diversify our commercial mortgage loan portfolio within California by both location and type of property in an effort to reduce earthquake exposure, such diversification may not eliminate the risk of such losses. (Exh. 2, p. 19.10).

Even more telling is the SIC's claim in its annual report that the sale of Stancorp's securities affects its financial outlook, "SALE, TRANSFER AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES" (Exh. 2, p.1910). SIC does not issue stock so it must be referring to Stancorp's stock.  SIC uses Stancorp's property as its own.

Under the multiple factor test enunciated in *Arellano v. Home Depot* SIC is the alter ego of the Stancorp, whose massive landholdings make it a citizen of California

for diversity purposes.

            c.  Even Under The Cases SIC Cites It Should Be Found To Be The Alter Ego Of The Standcorp

SIC relies on *American Tel. & Tel. Co. v. Compagnie Bruxelles Lambert* 94 F.3d 586, 591 (9th Cir. 1996) for the proposition that only two factors are needed to find an alter ego relationship between parent and subsidiary: unity of interest and ownership, and fraud or injustice. The facts from *AT&T* are distinguishable. *AT&T* filed suit against GBL Lambert and claimed that GBL was the alter ego of another company, Keystone. The AT&T court explained:

> GBL submitted affidavits from Rene Van Achter, a GBL employee who sat on Keystone's board of directors, stating that GBL conducted no business in the United States and had no direct involvement in operating Keystone's Bakersfield facility, and that no GBL or LBC employee was involved in Keystone's day-to-day affairs. GBL's indirect ownership of Keystone stock involved no contacts with California; Van Achter attended no meetings in California…
> Id at 589.

As stated above, unlike the facts of GBL and Keystone, Stancorp owns SIC as the wholly owned subsidiary, Stancorp's board controls SIC, Stancorp siphons off the assets of SIC, Stancorp underwrites the activities of SIC, SIC claims the assets of Stancorp as it's own, etc. That is total control and unity of interest.

      As mentioned, it is unfair for Stancorp and SIC to deny Duarte access to his local courts to litigate a local contract. Thus, under *AT&T*, Stancorp and SIC are the alter ego of one another, whereby SIC takes the citizenship of the parent company Stancorp.

    IV.    STANCORP BUSINESS ACTIVITIES PREDOMINATE IN CALIFORNIA MAKING IT A CALIFORNIA CORPORATION FOR DIVERSITY PURPOSES

Stancorp's presence in California makes it a California corporation for diversity purposes. The two principal factors are number of employees in the target state vs. any other, and the number of land holdings in the target state. *Arellano v. Home Depot U.S.A., Inc.,* 245 F.Supp.2d 1102, 1107-1108 (S.D.Cal.2003). The Court in Arellano applied citizenship tests based on the characteristics of the business entity:

> Arellano relies heavily on the holding in Tosco, but that case is

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA 94598

THE SEGOVIA LAW OFFICE

712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA 94598

1
2
3
4
5
6

distinguishable from the present case. In Tosco, the court held that California contained a substantial predominance of the plaintiff's business activities, where the corporation had 21% of its total workforce in California, received 40% of its total refining capacity from California, and had 37% of its retail locations in California. Tosco, 236 F.3d at 500-01. In arguing that California was not its principal place of business, Tosco erroneously compared its activities in California to its activities in the entire United States. Here, conversely, Home Depot provided the court with a comparison between California and other individual states. More importantly, the proportion of Home Depot's business activities in California is much less than that of the corporation in Tosco. *Id.*

7
8
9
10
11

Duarte has established from Stancorp's 10k form submitted to the SEC that independent contractors scattered about 41 states handle its operations. Duarte Remand Motion Exhibit 2, p5-6. That SIC now offers declarations contradicting their 2007 report to the SEC leads us to ask which is correct, the Form 10K or the Declaration of Molly Amano.

12
13
14
15
16
17
18
19

"Another factor courts consider in determining 'substantial predominance' is the location of the defendant's tangible property." Id. In *Arellano*, the Home Depot's property did not justify a finding of California citizenship because it had land holdings of "$629 million in Georgia, $604 million in Texas, and $408 million in California." Id. There is no dispute that the Stancorp's 12 billion dollars worth of land holdings in California, dwarfing all others, make California its predominant place of business Duarte Remand Motion. Stancorp is a Citizen of California along with its subsidiary SIC.

20

V.    THE PARENT COMPANY IS ALWAYS LIABLE FOR THE ACTS OF THE AGENT

21
22
23
24
25
26
27
28

The liability of the parent company for the acts of the agent are independent of and do not depend on the atler ego theory as explained by SIC's case *United States v. Best Foods*. "The fact that a corporate subsidiary happens to own a polluting facility operated by its parent does nothing, then, to displace the rule that the parent "corporation is [itself] responsible for the wrongs committed by its agents in the course of its business." *United States v. Best Foods*, 524 US 51, 65 (US 1998). This is an issue that cannot be ignored and will resurface upon a motion to amend naming Stancorp along with SIC.

: D' ReplyII.doc

**CONCLUSION**

Supplemental declarations are not permitted where the original lacks substance.  And in any event, the supplemental declarations are also equally defective and otherwise *not* permitted.

The Court must make an independent valuation and evaluation of the likelihood that Duarte may recover on each item prayed.  Duarte cited $28,800 in his Complaint at ¶91 as the amount in controversy and here proffers a settlement repartee to boost that claim.  Therefore, the amount in controversy does not exceed $75,000.

Due to billions of dollars in land holding in California, Stancorp is a citizen of California for diversity purposes.  SIC is likewise a citizen of California because it is an alter ego of Stancorp.

Finally, there is the equity argument that merits against diversity in this case. Duarte *never* reached out to Oregon to do business with SIC or Stancorp.  No.  Duarte merely accepted a California *government* job!  It would be patently unfair to Duarte and millions of others Californians similarly situated who, unbeknownst to them, have been deprived of seeking redress in their own courts by the efforts of their employer to provide them benefits through an insurance company holding billions of California assets and business but denies citizenship here by where it hangs its artwork.

It is SIC who in a-round-about-way came to California to do business with Duarte, not the other way around. So Duarte should be allowed to seek redress of a government employment matter in state court.

For the above reasons, Duarte prays his motions to strike and for remand are granted.

August 22, 2008          The Segovia Law Office
                         /s/ *Victor A. Segovia*
                         Counsel to Duarte

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA  94598

April 9, 2008

JOSE DUARTE
5319 Broadway Terrace, #103
Oakland, CA 94618
510-653-9999

Sent via US Mail

Eric E. Parsons, CEO and Chairman of the Board
StanCorp Financial Group, Inc.
P.O. Box 711
Portland, Oregon 97207

RE:     DUARTE CLAIM: ONE EXCUSE AFTER ANOTHER

Dear Eric E. Parsons

This letter is in response to the attached April 4, 2008, received on April 8, 2008 letter from Mr.
Weisbaum. I am glad that the people working under your direction have finally got it that I have the true
insurance policy. I am glad that the Standard finally gets it that under my insurance policy the so- called
24 month benefit limit does not apply to physical injuries that cause symptoms of mental illness or mental
illness that causes physical symptoms.

However, sadly, it looks like your spokesman, Mr. Weisbaum, is that, now that he has realized that I have
the real McCoy insurance policy, he's looking for new ways to deny my benefits to age 65. At least that's
how it looks to me.

I don't understand much about these insurance policies. They're hard for me to understand. My lawyer,
Leandro Durán retired. That's why I went to Mr. Durán to begin with to help me to understand, now that I
have so many difficulties and my health is so frail. Corwin got mad and yelled at me when I told him that
he should speak to my lawyer. I understand that it's against the law for anyone to bully the disabled or try
to keep them from getting a lawyer to help them.

To me that looks like Mr. Weisbaum is trying to pull the wool over my eyes now that I don't have a
lawyer to watch out for me. Mr. Weisbaum said before was that he was ready to grant my disability
benefits to age 65 if I could show him that my physical injuries caused my PTSD, or that my PTSD
caused me physical problems. I took him at his word, by givig him Dr. Matan's 2006 report showing that I
was physically attacked and can't do physical labor anymore, and by giving him Dr. Felix's 2007 report
showing that PTSD makes me go into physical wretching and convulsions. Dr. Felix's report shows that I
am disabled from all lines of work.

Now, Mr. Weisbaum has come up with another excuse- it's been more than 180 days since we denied
your benefits. I have no idea what he is trying to say when he wants me to get back in touch with him.

After August 2005, when Follett and Corwin pulled out their bogus policies and told me to go away, I
thought I could never get fair review and that was it. Most of all, since I have been disabled since
December 4, 2003 and your employees discontinued my benefits, I have lived on the margin. My daily
struggle is to buy groceries and keep the electricity on. Thanks to what your employees did I did not have
the money to get more medical reports than the original ones. By cutting me off, you made sure that I
could never give you the information that you supposedly wanted- 180 days or whenever.

Exhibit 1

In 2006 and 2007, Drs. Matan and Felix provided their reports at no cost to me.  Now, that I give you all those reports showing that I should get my benefits to age 65, your spokesman, Mr. Weisbaum, makes up another excuse.

There is another issue that has never been resolved: whether my benefits are 2/3s of my former monthly salary or $1200.  It cannot be ignored.

I will allow you to review my submitted reports from Dr. Matan and Felix one more time (although I thought that's what Weisbaum was doing when he wrote to me the first time; apparently he wasn't telling the truth).   I will allow the Standard Insurance company to do their review, which I think has already been done.  By April 18, 2008, I look forward to a response paying my back due benefits of $28,800 and forward benefits starting on February 2, 2008.

So, my settlement demand/offer is the tendering of the policy limit of $28,800 for back due benefits and payment of benefits going forward to age 65 starting on February 2, 2008, by April 18, 2008.  If that does not happen by April 18, 2008, I will take the next step.

Thank you for your attention to this matter.  If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

JOSE DUARTE

Exhibit 1



April 17, 2008

JOSE DUARTE
5319 BROADWAY TERRACE NO 103
OAKLAND, CA 94618

Re:   OAKLAND UNIFIED SCHOOL DIST
      Group No.        614371
      Claim No.        00085058

Dear Mr. Duarte::

Your correspondence of April 9, 2008 to Eric Parsons concerning your closed claim for Long Term Disability (LTD) Benefits with Standard Insurance Company (The Standard) has been forwarded to me for response.

In my prior letters of April 4, 2008 and April 10, 2008 I indicated that Standard has agreed to accept your request for a review of our determination to close your claim for LTD Benefits. We agreed to the review even though your request was outside the 180 days allowed by the Group Policy. You assert that the closure of your LTD claim assured that you could not provide information timely. I disagree with this statement. Our correspondence of August 31, 2005 notified you that your claim would be closing with payment to you through February 2, 2006. In addition, this correspondence stated that if you wanted us to review that decision you would need to submit your request in writing within 180 days after the receipt of our letter and provide any additional documentation to support your position. With your correspondence of March 28, 2008 you included the report from Dr. Matan dated October 24, 2005. Thus, this report would reasonably have been available for you to provide to us within 180 days of our August 31, 2005 correspondence.

You stated that we were ready to reopen your LTD claim with benefits payable to age 65 if you could provide documentation that your physical injuries caused your PTSD or vice versa and you stated, "to me it looks like Mr. Weisbaum is trying to pull the wool over my eyes now that I don't have a lawyer to watch our for me." Additionally, in your recent letter to Eric Parsons you stated that the 24 month Mental Disorder limitation, "does not apply to physical injuries that cause symptoms of mental illness or mental illness that causes physical symptoms." I have not made these statements or representations in my letter to you and your statement does not accurately depict the provisions of the Group Policy. As stated in our prior correspondence to you of August 31, 2005, February 28, 2006, April 4, 2008 and April 10, 2008 the Oakland Unified School District Group Policy limits payment of LTD Benefits to 24 months for conditions caused or contributed to by Mental Disorders. The medical documentation in your claim file indicates that you became Disabled due to Post Traumatic Stress Disorder (PTSD) with a secondary

PO Box 2800  Portland OR 97208-2800  tel 800.368.1135
Standard Insurance Company - A subsidiary of StanCorp Financial Group



diagnosis of Major Depression. Although these conditions were caused or contributed to by the attack on you at school these conditions are Mental Disorders as defined by the Group Policy and limited to 24 months of benefit payments.

The file documentation also indicates that you have left shoulder pain as the result of the attack at school. Documentation in your claim file indicates that your pain is due to the diagnosis of left shoulder impingement syndrome. Reasonably, this is a physical condition that would not cause by a mental illness such as either PTSD or Major Depression. In addition, PTSD and Major Depression would not reasonably cause your left shoulder impingement. As such, we are reviewing the documentation in your claim file to determine if you were Disabled as defined by the Group Policy and unable to perform Any Occupation due to conditions not subject to the Mental Disorder Limitation as of February 3, 2006 and continuing.

You have inquired whether your LTD Benefit monthly payment should have been paid based upon 66 2/3% of your Predisability Earnings (see policy provision in Group Policy previously forwarded) or a maximum benefit of $1,200.00 per month. Your Own Occupation for the Oakland Unified School District was that of a Teacher. Teachers are Class 1 Members as defined by the Group Policy (See Coverage Features, page 1, in the Group Policy which was previously forwarded to you). The Schedule Of Insurance in the Group Policy indicates that the LTD Benefit for Class 1 Members is the sum of:

*1. 66 2/3% of the first $1,200 of your Predisability Earnings; and*
*2. 33 1/3% of the next $1,200 of your Predisability Earnings, reduced by Deductible income.*

The group policy also has a Maximum monthly benefit of $1,200 for Class 1 Members.

The Employer's Statement in your claim file indicates that your Predisability Earnings were $4,681. Therefore, you were only eligible for the maximum monthly benefit of $1,200. As such, my review indicates that we paid you the correct amount of LTD Benefits and you would not have been eligible for 66 2/3% of your Predisability Earnings of $4,681.

You have requested that The Standard pay you retroactive benefits in the amount of $28,800 and continue benefits going forward to age 65 and make and communicate this decision to you by April 18, 2008. Mr. Duarte, we are in the process of reviewing all information in your LTD claim file, including the two evaluations forwarded with your correspondence of March 28, 2008 and any additional documentation that you may submit, such as the documentation noted in our letter of April 10, 2008. Our review will include a review of the medical documentation in your claim file by a board certified Physician Consultant in the appropriate specialty to assist us in identifying any limitations or restrictions you may have due to your left shoulder. If the documentation supports that you were Disabled and unable to perform Any Occupation as of February 3, 2008 and continuing due to a condition not subject to the Mental Disorder limitation (such as PTSD and Major Depression) we will forward you retroactive benefits immediately. If

Exhibit 1

JOSE DUARTE                                      3                                   April 17, 2008

not, your claim will be forwarded to our Administrative Review Unit for an independent review
as allowed by the Group Policy. Because we are continuing our review of your claim we cannot
comply with the deadline you established in your most recent letter to Eric Parsons. We will
continue to keep you appraised of the status of our review and will completely respond to the
concerns you've raised regarding your medical condition.

Please contact me with any questions or concerns you may have regarding this letter or any
aspect of your LTD claim.

Sincerely,

*Bruce Weisba*

Bruce Weisbaum
Supervisor, Disability Benefits
800-368-1135  ext. 6882

Cc:        Eric Parsons, Chairman, President & CEO
           Justin Delaney, VP&Asst General Counsel

Exhibit 1



LIFE AND ACCIDENT AND HEALTH COMPANIES - ASSOCIATION EDITION

# ANNUAL STATEMENT

### FOR THE YEAR ENDED DECEMBER 31, 2007
### OF THE CONDITION AND AFFAIRS OF THE

## Standard Insurance Company

NAIC Group Code ___1348___ ___1348___ NAIC Company Code ___69019___ Employer's ID Number ___93-0242990___
(Current)     (Prior)

Organized under the Laws of _____Oregon_____, State of Domicile or Port of Entry _____Oregon_____

Country of Domicile _____United States of America_____

Incorporated/Organized ___02/24/1906___ Commenced Business ___04/12/1906___

Statutory Home Office ___1100 Southwest Sixth Avenue___, ___Portland , OR 97204-1093___
(Street and Number)                    (City or Town, State and Zip Code)

Main Administrative Office ___1100 Southwest Sixth Avenue___
(Street and Number)

___Portland , OR 97204-1093___, ___971-321-7000___
(City or Town, State and Zip Code)                    (Area Code) (Telephone Number)

Mail Address ___PO Box 711___, ___Portland , OR 97207-0711___
(Street and Number or P.O. Box)                    (City or Town, State and Zip Code)

Primary Location of Books and Records ___1100 Southwest Sixth Avenue___
(Street and Number)

___Portland , OR 97204-1093___, ___971-321-7550___
(City or Town, State and Zip Code)                    (Area Code) (Telephone Number)

Internet Website Address ___www.standard.com___

Statutory Statement Contact ___Will  Fundak___, ___971-321-7550___
(Name)                    (Area Code) (Telephone Number)

___wfundak@standard.com___, ___971-321-7540___
(E-mail Address)                    (FAX Number)

### OFFICERS

President & Chief Executive Officer ___Eric Edmond Parsons___ Controller ___Robert Michael Erickson CMA #___

Corporate Secretary ___Holley Young Franklin JD___ Corporate Actuary ___Sally Ann Manafi FSA___

### OTHER

### DIRECTORS OR TRUSTEES

| | | |
|---|---|---|
| Virginia Lynn Anderson | Frederick William Buckman | John Edgar Chapoton |
| Stanley Russel Fallis | Wanda Gayle Henton | Peter Ogden Kohler MD |
| Jerome Jurgen Meyer | Eric Edmond Parsons | Ralph Randall Peterson |
| Esther Kay Stepp | Michael Glenn Thorne | Ronald Ernest Timpe |

State of ___Oregon___
County of ___Multnomah___ SS:

The officers of this reporting entity being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to, is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended, and have been completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively.  Furthermore, the scope of this attestation by the described officers also includes the related corresponding electronic filing with the NAIC, when required, that is an exact copy (except for formatting differences due to electronic filing) of the enclosed statement. The electronic filing may be requested by various regulators in lieu of or in addition to the enclosed statement.

_____    _____    _____
Eric Edmond Parsons              Robert Michael Erickson, CMA          Holley Young Franklin
President & Chief Executive Officer          Controller                    Corporate Secretary

Subscribed and sworn to before me this

a. Is this an original filing? ........................ Yes [ X ] No [   ]
b. If no,
___19th___ day of ___February 2008___
1. State the amendment number..........
2. Date filed ...............................................
3. Number of pages attached.............

Jessica Durand
Notary Public
04/03/2010

Exhibit 2

ANNUAL STATEMENT FOR THE YEAR 2007 OF THE  STANDARD INSURANCE COMPANY

## NOTES TO FINANCIAL STATEMENTS

2) Leases having initial or remaining non-cancelable lease terms in excess of one year

At January 1, 2008, the minimum aggregate rental commitments are as follows: (Dollars in thousands)

| Year Ending December 31 | Amount |
|---|---|
| 2008 | $ 15,748 |
| 2009 | $ 11,279 |
| 2010 | $ 6,707 |
| 2011 | $ 4,459 |
| 2012 | $ 2,543 |
| Thereafter | $ 1,220 |
| Total | $ 41,956 |

3) The Company is not involved in any sale-leaseback transactions.

B. Lessor Leases

The Company owns and leases real estate. It is an insignificant part of the business activities. The Company has no leveraged lease transactions.

16. INFORMATION ABOUT FINANCIAL INSTRUMENTS WITH OFF-BALANCE SHEET RISK AND FINANCIAL INSTRUMENTS WITH CONCENTRATIONS OF CREDIT RISK

A. Financial Instruments with Off-Balance Sheet Risk

None

B. Financial Instruments with Concentrations of Credit Risk

Our fixed maturity securities totaled $4,852,190,916 at December 31, 2007.  Our corporate bond industry diversification targets are based on the Lehman Investment Grade Credit Index, which is reasonably reflective of the mix of issuers broadly available in the market.  We also target a specified level of government, agency and municipal securities in our portfolio for credit quality and additional liquidity.  The overall credit quality of our fixed maturity investment securities was A- (Standard and Poor's) at December 31, 2007.  The percentage of fixed maturity securities below investment grade was 4.1% and 3.6% at December 31, 2007 and 2006, respectively.  Should the credit quality of our fixed maturity securities decline, there could be a material adverse effect on the Company's business, financial position, results of operations or cash flows.

Commercial mortgage loans in California represent a concentration of credit risk at 30.2% of our commercial mortgage loan portfolio at December 31, 2007. Due to this concentration, we are exposed to potential losses resulting from the risk of an economic downturn in California as well as to certain catastrophes, such as earthquakes, that may affect the region. Although we diversify our commercial mortgage loan portfolio within California by both location and type of property in an effort to reduce earthquake exposure, such diversification may not eliminate the risk of such losses. We do not require earthquake insurance for properties on which we make commercial mortgage loans, but do consider the potential for earthquake loss based upon seismic surveys and structural information specific to each property when new loans are underwritten.

Historically, our experience in California has been consistent with our experience in other states. However, if economic conditions in California decline, we could experience a higher delinquency rate on the portion of our commercial mortgage loan portfolio located in California, which could have a material adverse effect on the Company's business, financial position, results of operations or cash flows.

17. SALE, TRANSFER AND SERVICING OF FINANCIAL ASSETS AND EXTINGUISHMENTS OF LIABILITIES

A. Transfers of Receivables Reported as Sales

None

B. Transfers and Servicing of Financial Assets

None

C. Wash Sales

1) In the course of the Company's asset management, securities may be sold and reacquired within 30 days of the sale date to enhance the Company's yield on its investment portfolio.

2) The details, of NAIC designation 3 or below, of securities sold in 2007 and reacquired within 30 days of the sale are:

| Bond | Number of Transactions | Book Value of Securities Sold | Cost of Securities Repurchased | Gain/(Loss) |
|---|---|---|---|---|
| NAIC 4 | 1 | 77,686 | 77,489 | 197 |

18. GAIN OR LOSS TO THE REPORTING ENTITY FROM UNINSURED PLANS AND THE UNINSURED PORTION OF PARTIALLY INSURED PLANS

A. ASO Plans

Administration fees from services provided to uninsured and partially insured A&H (disability income) plans were $8,032,470.  Expenses were not segregated.  The net gain or loss from administrative services contracts was considered immaterial.



ANNUAL STATEMENT FOR THE YEAR 2007 OF THE  STANDARD INSURANCE COMPANY
## SCHEDULE T - PREMIUMS AND ANNUITY CONSIDERATIONS
Allocated by States and Territories

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| | | | | | Direct Business Only | | | |
| | | | Life Contracts | | Accident and Health Insurance Premiums, Including Policy, Membership and Other Fees | Other Considerations | Total Columns 2 through 5 | Deposit-Type Contracts |
| | States, Etc. | Is Insurer Licensed? (Yes or No) | Life Insurance Premiums | Annuity Considerations | | | | |
| 1. | Alabama .......... AL | YES | 9,080,277 | 1,108,209 | 17,403,528 | 6,698,309 | 34,290,323 | 0 |
| 2. | Alaska .......... AK | YES | 2,095,413 | 240,966 | 2,902,172 | 8,292,927 | 13,531,478 | 161,173 |
| 3. | Arizona .......... AZ | YES | 26,084,185 | 5,525,677 | 43,176,541 | 24,399,318 | 99,185,721 | 577,670 |
| 4. | Arkansas .......... AR | YES | 2,614,181 | 699,205 | 6,024,099 | 1,851,755 | 11,189,240 | 35,000 |
| 5. | California .......... CA | YES | 88,398,060 | 26,273,867 | 202,224,588 | 185,103,522 | 502,000,037 | 1,379,571 |
| 6. | Colorado .......... CO | YES | 26,736,752 | 2,609,447 | 43,505,203 | 101,036,505 | 173,887,907 | 91,390 |
| 7. | Connecticut .......... CT | YES | 9,598,234 | 2,626,656 | 17,182,903 | 1,508,708 | 30,916,501 | 0 |
| 8. | Delaware .......... DE | YES | 2,262,260 | 0 | 2,387,693 | 0 | 4,649,953 | 0 |
| 9. | District of Columbia .......... DC | YES | 8,674,359 | 110,000 | 6,606,072 | 536,506 | 15,926,937 | 283,881 |
| 10. | Florida .......... FL | YES | 51,454,083 | 7,493,941 | 80,231,691 | 36,322,710 | 175,502,425 | 71,246 |
| 11. | Georgia .......... GA | YES | 18,389,815 | 2,120,572 | 41,371,257 | 32,141,091 | 94,022,735 | 0 |
| 12. | Hawaii .......... HI | YES | 3,362,236 | 3,850,056 | 1,800,922 | 603,492 | 9,616,706 | 576,166 |
| 13. | Idaho .......... ID | YES | 18,813,683 | 975,436 | 16,916,190 | 2,878,671 | 39,583,980 | 43,060 |
| 14. | Illinois .......... IL | YES | 13,784,791 | 9,994,661 | 29,154,713 | 18,418,042 | 71,352,207 | 356,013 |
| 15. | Indiana .......... IN | YES | 12,042,316 | 2,768,478 | 12,419,023 | 51,222,173 | 78,451,990 | 45,000 |
| 16. | Iowa .......... IA | YES | 8,567,185 | 1,589,198 | 11,467,536 | 7,400,899 | 29,024,818 | 0 |
| 17. | Kansas .......... KS | YES | 12,149,662 | 195,532 | 15,595,690 | 8,658,412 | 36,599,296 | 0 |
| 18. | Kentucky .......... KY | YES | 2,964,673 | 603,457 | 6,457,485 | 33,125,608 | 43,151,223 | 0 |
| 19. | Louisiana .......... LA | YES | 9,399,722 | 2,387,915 | 11,042,398 | 22,941,371 | 45,771,406 | 0 |
| 20. | Maine .......... ME | YES | 1,177,875 | 124,442 | 3,954,655 | 3,227,543 | 8,484,515 | 0 |
| 21. | Maryland .......... MD | YES | 20,453,096 | 571,616 | 11,708,965 | 3,275,830 | 36,009,507 | 0 |
| 22. | Massachusetts .......... MA | YES | 15,229,998 | 1,687,138 | 51,214,796 | 7,465,032 | 75,596,964 | 0 |
| 23. | Michigan .......... MI | YES | 8,373,128 | 4,349,632 | 22,935,994 | 15,481,520 | 51,140,274 | 0 |
| 24. | Minnesota .......... MN | YES | 15,834,927 | 3,100,292 | 33,258,757 | 5,393,878 | 57,587,854 | 33,796 |
| 25. | Mississippi .......... MS | YES | 2,028,772 | 730,219 | 4,010,581 | 1,844,508 | 8,614,080 | 262,630 |
| 26. | Missouri .......... MO | YES | 43,568,742 | 1,034,640 | 33,641,656 | 26,515,649 | 104,760,687 | 114,715 |
| 27. | Montana .......... MT | YES | 4,731,173 | 1,316,573 | 4,004,949 | 1,142,403 | 11,195,098 | 0 |
| 28. | Nebraska .......... NE | YES | 1,811,511 | 1,107,971 | 5,203,189 | 559,068 | 8,681,739 | 0 |
| 29. | Nevada .......... NV | YES | 8,585,552 | 1,606,641 | 12,358,588 | 2,757,066 | 25,307,847 | 0 |
| 30. | New Hampshire .......... NH | YES | 1,167,575 | 5,692,353 | 3,212,567 | 2,277,345 | 12,349,840 | 0 |
| 31. | New Jersey .......... NJ | YES | 7,434,984 | 1,924,783 | 17,223,254 | 9,897,266 | 36,480,287 | 169,275 |
| 32. | New Mexico .......... NM | YES | 9,887,068 | 1,587,497 | 4,003,759 | 1,793,195 | 17,271,519 | 495,461 |
| 33. | New York .......... NY | NO | 1,264,600 | 1,172,817 | 3,242,571 | 0 | 5,679,988 | 0 |
| 34. | North Carolina .......... NC | YES | 14,531,849 | 6,752,714 | 20,060,130 | 8,435,841 | 49,780,534 | 64,376 |
| 35. | North Dakota .......... ND | YES | 1,629,400 | 476,652 | 3,151,186 | 969,439 | 6,226,677 | 0 |
| 36. | Ohio .......... OH | YES | 15,782,463 | 2,454,892 | 20,478,050 | 61,213,853 | 99,929,258 | 0 |
| 37. | Oklahoma .......... OK | YES | 9,167,187 | 507,793 | 11,343,412 | 26,551,259 | 47,569,651 | 190,817 |
| 38. | Oregon .......... OR | YES | 52,812,246 | 33,134,425 | 68,286,156 | 178,311,039 | 332,543,866 | 2,482,753 |
| 39. | Pennsylvania .......... PA | YES | 18,305,130 | 2,253,018 | 41,297,137 | 12,659,610 | 74,514,895 | 0 |
| 40. | Rhode Island .......... RI | YES | 3,249,110 | 0 | 2,899,751 | 0 | 6,148,861 | 0 |
| 41. | South Carolina .......... SC | YES | 4,985,550 | 6,619,025 | 16,659,252 | 4,032,936 | 32,296,763 | 0 |
| 42. | South Dakota .......... SD | YES | 555,980 | 275,000 | 1,102,193 | 0 | 1,933,173 | 0 |
| 43. | Tennessee .......... TN | YES | 8,721,996 | 946,696 | 20,019,989 | 2,325,970 | 32,014,651 | 284,805 |
| 44. | Texas .......... TX | YES | 72,129,354 | 21,009,788 | 85,550,390 | 133,289,183 | 311,978,715 | 493,134 |
| 45. | Utah .......... UT | YES | 11,444,667 | 594,655 | 13,574,376 | 15,631,461 | 41,245,159 | 30,609 |
| 46. | Vermont .......... VT | YES | 2,095,408 | 344,222 | 4,551,592 | 159,804 | 7,151,026 | 0 |
| 47. | Virginia .......... VA | YES | 7,811,914 | 1,316,112 | 19,967,773 | 11,368,299 | 40,464,098 | 0 |
| 48. | Washington .......... WA | YES | 36,455,111 | 12,325,969 | 109,120,163 | 96,971,130 | 254,872,373 | 1,163,234 |
| 49. | West Virginia .......... WV | YES | 1,165,151 | 0 | 4,966,176 | 0 | 6,131,327 | 48,293 |
| 50. | Wisconsin .......... WI | YES | 8,356,437 | 1,910,182 | 15,940,448 | 1,869,523 | 28,076,590 | 173,173 |
| 51. | Wyoming .......... WY | YES | 1,306,729 | 700 | 1,763,648 | 120,569 | 3,191,654 | 0 |
| 52. | American Samoa .......... AS | NO | 0 | 0 | 3,468 | 0 | 3,468 | 0 |
| 53. | Guam .......... GU | YES | 646,206 | 0 | 1,739,308 | 0 | 2,385,514 | 0 |
| 54. | Puerto Rico .......... PR | NO | 12,865 | 0 | 261,484 | 0 | 274,349 | 0 |
| 55. | U.S. Virgin Islands .......... VI | YES | 71,347 | 0 | 100,553 | 0 | 171,900 | 0 |
| 56. | Northern Mariana Islands .......... MP | NO | 1,478 | 0 | 0 | 0 | 1,478 | 0 |
| 57. | Canada .......... CN | NO | 719,174 | 0 | 296,312 | 0 | 1,015,486 | 0 |
| 58. | Aggregate Other Aliens .......... OT | XXX | 236,769 | 184,093 | 64,729 | 0 | 485,591 | 0 |
| 59. | Subtotal | (a)    52 | 740,214,409 | 188,285,831 | 1,241,041,661 | 1,178,680,238 | 3,348,222,139 | 9,652,241 |
| 90. | Reporting entity contributions for employee benefits plans.......... | XXX | 780,872 | | 2,978,281 | | 3,759,153 | |
| 91. | Dividends or refunds applied to purchase paid-up additions and annuities.......... | XXX | 21,079,359 | | 0 | | 21,079,359 | |
| 92. | Dividends or refunds applied to shorten endowment or premium paying period.......... | XXX | 0 | | 0 | | 0 | |
| 93. | Premium or annuity considerations waived under disability or other contract provisions.......... | XXX | 256,881 | | 0 | | 256,881 | |
| 94. | Aggregate or other amounts not allocable by State.......... | XXX | 0 | | 0 | | 0 | |
| 95. | Totals (Direct Business).......... | XXX | 762,331,521 | 188,285,831 | 1,244,019,942 | 1,178,680,238 | 3,373,317,532 | 9,652,241 |
| 96. | Plus reinsurance assumed.......... | XXX | 7,225,307 | | 129,234,177 | | 136,459,484 | |
| 97. | Totals (All Business).......... | XXX | 769,556,828 | 188,285,831 | 1,373,254,119 | 1,178,680,238 | 3,509,777,016 | 9,652,241 |
| 98. | Less reinsurance ceded.......... | XXX | 62,787,113 | | 68,013,365 | | 130,800,478 | |
| 99. | Totals (All Business) less Reinsurance Ceded | XXX | 706,769,715 | 188,285,831 | 1,305,240,754 | 1,178,680,238 | 3,378,976,538 | 9,652,241 |
| | DETAILS OF WRITE-INS | | | | | | | |
| 5801. | United Kingdom | XXX | 68,007 | | 15,970 | | 83,977 | |
| 5802. | Japan | XXX | 30,556 | 4,800 | 3,378 | | 38,734 | |
| 5803. | Australia | XXX | 29,571 | | 3,704 | | 33,275 | |
| 5898. | Summary of remaining write-ins for Line 58 from overflow page.......... | XXX | 108,635 | 179,293 | 41,677 | 0 | 329,605 | 0 |
| 5899. | Totals (Lines 5801 through 5803 plus 5898)(Line 58 above).......... | XXX | 236,769 | 184,093 | 64,729 | 0 | 485,591 | 0 |
| 9401. | .......... | XXX | | | | | | |
| 9402. | .......... | XXX | | | | | | |
| 9403. | .......... | XXX | | | | | | |
| 9498. | Summary of remaining write-ins for Line 94 from overflow page.......... | XXX | 0 | 0 | 0 | 0 | 0 | 0 |
| 9499. | Totals (Lines 9401 through 9403 plus 9498)(Line 94 above).......... | XXX | 0 | 0 | 0 | 0 | 0 | 0 |

Explanation of basis of allocation by states, etc., of premiums and annuity considerations

Individual insurance premiums, annuity and other considerations are allocated to the state to which the premium statements are mailed.  Group insurance premiums (for groups with less than 500 lives) are allocated to the state to which the billing statements are mailed.  For groups with 500 or more lives, insurance premiums are allocated among the states where the insureds reside, based upon data furnished by the policyholder.

(a) Insert the number of yes responses except for Canada and Other Alien.

(b) Column 4 should balance with Exhibit 1, Lines 6.4, 10.4, and 16.4, Cols. 8, 9, 10, or with Schedule H, Part 1, Line 1, indicate which:

Exhibit 1, Lines 6.4, 10.4, and 16.4, Cols. 8, 9, 10..........



**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2007

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission File Number: 1-14925

# STANCORP FINANCIAL GROUP, INC.
(Exact name of registrant as specified in its charter)

**Oregon**                                                      **93-1253576**
(State or other jurisdiction of incorporation or organization)        (I.R.S. Employer Identification No.)

**1100 SW Sixth Avenue, Portland, Oregon, 97204**
(Address of principal executive offices, including zip code)

Registrant's telephone number, including area code: (971) 321-7000

Securities registered pursuant to Section 12(b) of the Act:

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
| --- | --- |
| Common Stock | New York Stock Exchange |
| Series A Preferred Share Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of the 10-K or any amendment to the Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.
Large accelerated filer ☒   Accelerated filer ☐   Non-accelerated filer ☐   Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of June 29, 2007, was approximately $2.75 billion based upon the closing price of $52.48 on June 29, 2007. For this purpose, directors and executive officers of the registrant are assumed to be affiliates.

As of February 22, 2008, there were 49,011,892 shares of the registrant's common stock, no par value, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement for its 2008 Annual Meeting of Shareholders are incorporated by reference in Parts I and III.

Exhibit 3

Standard participates in a reinsurance and third party administration arrangement with Northwestern Mutual under which Northwestern Mutual group long term and short term disability products are sold using Northwestern Mutual's agency distribution system. Generally, Standard assumes 60% of the risk, and receives 60% of the premiums for the policies issued. If Standard were to become unable to meet its obligations, Northwestern Mutual would retain the reinsured liabilities. Therefore, in accordance with an agreement with Northwestern Mutual, Standard established a trust for the benefit of Northwestern Mutual with the market value of assets in the trust equal to Northwestern Mutual's reinsurance receivable from Standard. The market value of assets required to be maintained in the trust at December 31, 2007, was $218.0 million. Premiums assumed by Standard for the Northwestern Mutual business accounted for 3% of the Company's total premiums for each of the three years 2007, 2006 and 2005. In addition to assuming risk, Standard provides product design, pricing, underwriting, legal support, claims management and other administrative services under the arrangement.

Standard maintains a strategic marketing alliance with Ameritas that offers Standard's policyholders more flexible dental coverage options and access to Ameritas' nationwide preferred provider organization panel of dentists. As part of this alliance, Standard and Ameritas entered into a reinsurance agreement that provides for 20% of the net dental premiums written by Standard and the risk associated with these premiums to be ceded to Ameritas.

In addition to product-specific reinsurance arrangements, we maintain reinsurance coverage for certain catastrophe losses related to group life and AD&D. This agreement excludes nuclear, biological and chemical acts of terrorism. Through a combination of this agreement and our participation in a catastrophe reinsurance pool discussed below, we have coverage of up to $453.0 million per event.

Subsequent to the terrorist events of September 11, 2001, we entered into a catastrophe reinsurance pool with other insurance companies. This pool spreads catastrophe losses on group life and AD&D over 29 participating members. The annual fee paid by the Company in 2007 to participate in the pool was minor. As a member of the pool, we are exposed to maximum potential losses experienced by other participating members of up to $90.9 million for a single event for losses submitted by a single company and a maximum of $227.2 million for a single event for losses submitted by multiple companies. The Company's percentage share of losses experienced by pool members will change over time as it is a function of our group life and AD&D in force relative to the total group life and AD&D in force for all pool participants. The reinsurance pool does not exclude war or nuclear, biological and chemical acts of terrorism.

The Terrorism Risk Insurance Act of 2002 ("TRIA"), which has been extended through 2014, provides for federal government assistance to property and casualty insurers in the event of material losses due to terrorist acts on behalf of a foreign person or foreign interest. Due to the concentration of risk present in group life insurance and the fact that group life insurance is not covered under TRIA, an occurrence of a significant catastrophe or a change in the on-going nature and availability of reinsurance and catastrophe reinsurance could have a material adverse effect on the Company.

### Asset/Liability and Interest Rate Risk Management

See Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Asset/Liability and Interest Rate Risk Management."

### INVESTMENTS

Investment management is an integral part of our business. Investments are maintained to ensure that asset types and maturities are appropriate for the Company's policy reserves and other liabilities so that we can meet our obligations to policyholders under a wide variety of economic conditions. A substantial portion of our insurance subsidiaries' policy liabilities result from long term disability reserves that have proven to be very stable over time, and annuity products on which interest rates can be adjusted periodically, subject to minimum interest rate guarantees. Policyholders or claimants may not withdraw funds from the large block of disability reserves. Instead, claim payments are issued monthly over periods that may extend for many years. Holding these stable long-term reserves makes it possible to allocate a significant portion of invested assets to long-term fixed-rate investments, including commercial mortgage loans. The ability to allocate a significant portion of investments to commercial mortgage loans, combined with StanCorp Mortgage Investors' unique expertise with respect to its market niche for fixed-rate commercial mortgage loans, allows us to enhance the yield on the overall investment portfolio beyond that available through fixed maturity securities with an equivalent risk profile. See Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Investing Cash Flows" and Item 8, "Financial Statements and Supplementary Data—Notes to Consolidated Financial Statements."



Exhibit 3

important factor in establishing the competitive position of insurance companies. Ratings are important to maintaining public confidence in our company and in our ability to market our products. Rating organizations continually review the financial performance and condition of insurance companies, including our company. A significant ratings downgrade could increase our surrender levels and could adversely affect our ability to market our products and thereby have a material adverse effect on our business, financial position, results of operations or cash flows.

- **Our profitability may be affected by changes in state and federal regulation**—Our business is subject to comprehensive state regulation and supervision throughout the United States. While we cannot predict the impact of potential or future state or federal legislation or regulation on our business, future laws and regulations, or the interpretation thereof, could have a material adverse effect on our business, financial position, results of operations or cash flows.

- **Our business is subject to litigation risk**—In the normal course of business, we are a plaintiff or defendant in actions arising out of our insurance business and investment operations. We are from time to time involved in various governmental and administrative proceedings. While the outcome of any pending or future litigation cannot be predicted, as of the date hereof, we do not believe that any pending litigation will have a material adverse effect on our results of operations and financial condition. However, no assurances can be given that such litigation would not materially and adversely affect our business, financial position, results of operations or cash flows.

- **The concentration of our investments in California may subject us to losses resulting from an economic downturn as well as certain catastrophes in this state**—Our commercial mortgage loans are concentrated in the western region of the U.S., particularly in California. Due to this concentration, we are exposed to potential losses resulting from the risk of an economic downturn in California as well as to certain catastrophes, such as earthquakes and fires, which may affect the region. Although we diversify our commercial mortgage loan portfolio within California by both location and type of property in an effort to reduce earthquake exposure, such diversification may not eliminate the risk of such losses, which could have a material adverse effect on our business, financial position, results of operations or cash flows.

- **We may be exposed to environmental liability from our commercial mortgage loan and real estate investments**—As a commercial mortgage lender, we customarily conduct environmental assessments prior to making commercial mortgage loans secured by real estate and before taking title through foreclosure to real estate collateralizing delinquent commercial mortgage loans held by us. Based on our environmental assessments, we believe that any compliance costs associated with environmental laws and regulations or any remediation of affected properties would not have a material adverse effect on our results of operations or financial condition. However, we cannot provide assurance that material compliance costs will not be incurred by us.

- **As a holding company, we depend on the ability of our subsidiaries to transfer funds to us in sufficient amounts to pay dividends to shareholders, make payments on debt securities and meet our other obligations**—We are a holding company for our insurance and asset management subsidiaries and do not have any significant operations of our own. Dividends and permitted payments from our subsidiaries are our principal source of cash to meet our other obligations, pay dividends to shareholders and make payments on debt securities. As a result, our ability to pay dividends to shareholders and interest payments on debt securities primarily will depend upon the receipt of dividends and other distributions from our subsidiaries.

Many of our subsidiaries are non-insurance businesses and have no regulatory restrictions on dividends. Our insurance subsidiaries, however, are regulated by insurance laws and regulations that limit the maximum amount of dividends, distributions and other payments that they could declare and pay to us without prior approval of the states in which the subsidiaries are domiciled. Under Oregon law, Standard Insurance Company may pay dividends only from the earned surplus arising from its business. Oregon law gives the Director of the Oregon Department of Consumer and Business Services—Insurances Division ("Oregon Insurance Division") broad discretion regarding the approval of dividends. Oregon law requires us to receive the prior approval of the Oregon Insurance Division to pay a dividend if such dividend exceeds certain statutory limitations; however, it is at the Oregon Insurance Division's discretion to request prior approval of dividends at any time. See Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Capital Management—Dividends from Subsidiaries."



- **Our business may be affected by employment and wage growth**—Two factors in the growth of StanCorp's group businesses are the employment levels, and salary and wage growth of its employer groups. A reduction in either of these factors may affect premium levels for our group businesses.
- **Our profitability may be adversely affected by declining equity markets**—Sustained equity market declines could result in decreases in the value of our retirement plans assets under administration, which could reduce our ability to earn administrative fee income derived from the value of those assets.

## Item 1B. Unresolved Staff Comments

None.

## Item 2.  Properties

Principal properties owned by Standard Insurance Company ("Standard") and used by the Company consist of two office buildings in downtown Portland, Oregon: the Standard Insurance Center, with approximately 460,000 square feet; and the Standard Plaza, with approximately 220,000 square feet. Both of our business segments use the facilities described above. The Company also owns a building with 72,000 square feet of office space in Hillsboro, Oregon, which is used by StanCorp Mortgage Investors, LLC and our group insurance claims operations. A second building with 72,000 square feet was completed in the first quarter of 2007 and is used by our group operations. In addition, Standard leases 160,000 square feet of office space located in downtown Portland, Oregon, for home office and claims operations and 60,000 square feet of offsite storage. The

Company leases 66 offices under commitments of varying terms to support its sales and regional processing offices throughout the United States. Management believes that the capacity and types of facilities are suitable and adequate. Management may evaluate additional square footage in 2008 to accommodate its increasing workforce. See Part II, Item 8, "Financial Statements and Supplementary Data—Note 1 to Consolidated Financial Statements."

## Item 3.  Legal Proceedings

In the normal course of business, the Company is involved in various legal actions and other state and federal proceedings. A number of actions or proceedings were pending as of December 31, 2007. In some instances, lawsuits include claims for punitive damages and similar types of relief in unspecified or substantial amounts, in addition to amounts for alleged contractual liability or other compensatory damages. In the opinion of management, the ultimate liability, if any, arising from the actions or proceedings is not expected to have a material adverse effect on the Company's business, financial position, results of operations or cash flows.

## Item 4.  Submission of Matters to a Vote of Security Holders

There were no matters submitted to a vote of StanCorp's shareholders during the fourth quarter of 2007.

## Item 4A. Executive Officers of the Registrant

The information with respect to executive officers is set forth pursuant to General Instruction G of Form 10-K.

The following table sets forth the executive officers of StanCorp:

| Name | Age (as of February 27, 2008) | Position |
| --- | --- | --- |
| Robert M. Erickson | 39 | Assistant Vice President, Controller and Principal Financial Officer of StanCorp and Standard Insurance Company |
| Kim W. Ledbetter* | 55 | Senior Vice President, Asset Management Group of Standard Insurance Company |
| J. Gregory Ness* | 50 | Senior Vice President, Insurance Services Group of Standard Insurance Company |
| Eric E. Parsons | 59 | Chairman, President and Chief Executive Officer of StanCorp and Standard Insurance Company |
| Michael T. Winslow | 53 | Senior Vice President and General Counsel of StanCorp and Standard Insurance Company |

*Denotes an officer of a subsidiary who is not an officer of StanCorp but who is considered an "executive officer" of StanCorp under the regulations of the Securities and Exchange Commission.



Set forth below is biographical information for the executive officers of StanCorp:

**Robert M. Erickson,** CMA, has been assistant vice president and controller of StanCorp and Standard Insurance Company ("Standard") since July 2005. In June 2007, he began fulfilling the duties of the Principal Financial Officer on an interim basis until a successor Chief Financial Officer is in place. Since 2000, Mr. Erickson has held several leadership roles in the Corporate Financial Services division of Standard, most recently as corporate divisional controller of Standard.

**Kim W. Ledbetter**, FSA, CLU, has been senior vice president, Asset Management group of Standard since the Company's segment realignment in January 2006. Since June 2004, Mr. Ledbetter was senior vice president, asset management and individual disability of Standard, which included responsibility for Standard's investment operations, including StanCorp Mortgage Investors, LLC, StanCorp Investment Advisers, Inc., our real estate department, and the individual insurance and retirement plans divisions. Since 1997, Mr. Ledbetter was senior vice president, retirement plans division of Standard.

**J. Gregory Ness**, LLIF, has been senior vice president, Insurance Services group of Standard since the Company's segment realignment in January 2006. Since April 2004, Mr. Ness was senior vice president, group insurance division of Standard. Since 1999, Mr. Ness was senior vice president, investments of Standard.

**Eric E. Parsons** has been chairman, president and chief executive officer of StanCorp and Standard since May 2004. Prior to this, Mr. Parsons was president since May 2002 and chief executive officer since January 2003. Mr. Parsons was senior vice president and chief financial officer of StanCorp from 1999 through 2002 and was chief financial officer of Standard from 1998 through 2002.

**Michael T. Winslow**, JD, has been senior vice president and general counsel of StanCorp and Standard since July 2004. Mr. Winslow has also performed the duties of assistant corporate secretary since February 2007. Since 2001, Mr. Winslow was vice president, general counsel and corporate secretary of StanCorp and Standard. Prior to joining StanCorp, Mr. Winslow served as assistant general counsel and chief compliance officer for PacifiCorp.

Exhibit 3

### Item 5.  Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

All share information below has been adjusted to reflect the December 9, 2005, two-for-one stock split, affected as a share dividend, of the Company's common stock. StanCorp's common stock is listed on the New York Stock Exchange under the symbol "SFG." As of February 22, 2008, there were 40,630 shareholders of record of common stock.

The following tables set forth the high and low sales prices as reported by the New York Stock Exchange at the close of the trading day and cash dividends paid per share of common stock by calendar quarter:

|  | 2007 | | | |
|  | 4th Qtr | 3rd Qtr | 2nd Qtr | 1st Qtr |
|---|---|---|---|---|
| High | $55.13 | $52.79 | $52.89 | $49.82 |
| Low | 49.28 | 41.44 | 46.99 | 44.88 |
| Dividends paid | 0.72 | — | — | — |

|  | 2006 | | | |
|  | 4th Qtr | 3rd Qtr | 2nd Qtr | 1st Qtr |
|---|---|---|---|---|
| High | $46.27 | $51.68 | $55.75 | $54.55 |
| Low | 44.29 | 42.07 | 46.22 | 47.64 |
| Dividends paid | 0.65 | — | — | — |

The declaration and payment of dividends in the future is subject to the discretion of StanCorp's board of directors. It is anticipated that annual dividends will be paid in December of each year depending on StanCorp's financial condition, results of operations, cash requirements, future prospects, regulatory restrictions on the distributions from the insurance subsidiaries, the ability of the insurance subsidiaries to maintain adequate capital and other factors deemed relevant by StanCorp's board of directors. See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations—Capital Management." See also Item 1A, "Risk Factors—As a holding company, we depend on the ability of our subsidiaries to transfer funds to us in sufficient amounts to pay dividends to shareholders, make payments on debt securities and meet our other obligations."

The following graph provides a comparison of the cumulative total shareholder return on the Company's common stock with the cumulative total return of the Standard & Poor's ("S&P") 500 Index, the S&P Life and Health Insurance Index and the S&P Insurance Group Index. The comparison assumes $100 was invested on December 31, 2002, in the Company's common stock and in each of the foregoing indexes, and assumes the reinvestment of dividends. The graph covers the period of time beginning December 31, 2002, through December 31, 2007.

## Comparison of Five Year Cumulative Total Return

Among StanCorp Financial Group, Inc., the S&P 500 Index,
the S&P Life & Health Insurance Index and the S&P 500 Insurance Group



Exhibit 3

1  Victor A. Segovia, Esq. Bar No. 146576
   The Segovia Law Office
2  712 Bancroft Road, Number 268
   Walnut Creek, CA 94598
3  (925) 674-0185; (925) 674-0165 fax

4  For Plaintiff Jose Duarte

5              IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7  JOSE DUARTE                           CASE NO: CV 08-03021 JSW

8        Plaintiff,                      Hearing: August 29, 2008
                                         Time: 9:00 AM
   vs.                                   Courtroom 2, 17th Floor
9                                        450 Golden Gate Avenue
   THE STANDARD INSURANCE                San Francisco, California
10 COMPANY, a subdivision of STANCORP,
   and DOES 1 THROUGH 50,
11      Defendants

12        **DUARTE CERTIFICATE OF SERVICE ON REPLY:**
13 ALL PARTIES RECEIVE SERVICE BY ELECTRONIC MEANS THROUGH THE
   COURT'S ECF SYSTEM.  UNDERSIGN IS NOT AWARE OF ANY OTHER
14 PARTY REQUIRING SERVICE BY OTHER MEANS.
        On the date below, UNDERSIGN CAUSED TO BE SERVED:
15
16     **DUARTE REPLY TO OPPOSITION TO STRIKE AND REMAND**

17 I certify the foregoing is true and correct and that this was executed in Walnut Creek,
   California on:

18 August 22, 2008              The Segovia Law Office
                                /S/ *Victor A. Segovia*
19                              Counsel to Plaintiff

20 Service List:

21 | Standard Insurance Company | Katherine Ritchey |
   |---|---|
   | | Jones Day |
22 | | 555 California Street, Floor 26 |
   | | San Francisco, CA 94104 |

23

24

25

26

27

28

THE SEGOVIA LAW OFFICE
712 BANCROFT ROAD NUMBER 268
WALNUT CREEK, CALIFORNIA 94598